**CENTRAL DAUPHIN SCHOOL DISTRICT, Petitioner**

v.

**FOUNDING COALITION of the INFINITY CHARTER SCHOOL, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 10, 2003.

Decided April 15, 2004.

Ann E. Rhoads, Harrisburg, for petitioner.

Robert W. O'Donnell, Philadelphia, for respondent.

BEFORE: COLINS, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, COHN, Judge, and SIMPSON, Judge.

OPINION BY Judge McGINLEY.

The Central Dauphin School District (CDSD) petitions for review of the order of the State Charter School Appeal Board (Board) that reversed the CDSD's decision to deny Infinity Charter School's (ICS) application for a school charter.

On July 30, 2001, ICS applied[1] for a charter with the CDSD and sought to operate a charter school that would serve students in grades K–12[2] within the CDSD pursuant to the Charter School Law (Law).[3] The primary purpose of ICS is to provide an educational option for mentally gifted students.[4] Prior to the submission of its application, ICS held eight public meetings to provide information on the proposed charter school. A special information meeting was held for teachers on April 5, 2001.

After public meetings and a public hearing the CDSD issued a notice of denial of the application on November 21, 2001. The CDSD denied the application for the following reasons: the proposed charter school would impermissibly discriminate on the basis of intellectual ability, measures of achievement or aptitude; ICS failed to demonstrate sustainable support for the school; ICS failed to provide sufficient information with respect to the proposed site; ICS did not establish a satisfactory plan or demonstrate the ability to meet the financial needs of the school; the application should have been filed as a regional charter school; ICS failed to establish that it would provide opportunities not readily available to students in the CDSD; ICS failed to identify proposed faculty and staff; and ICS failed to present required reports and clearances.

The Court of Common Pleas of Dauphin County certified that ICS obtained the requisite signatures.[5] On August 29, 2002, ICS appealed to the Board.

---

1. The application included the following: letters of support; newspaper articles; eighty-five pre-enrollments that contained the names of fifty-nine residents of the CDSD; a summary of revenue and expenditures; cash flow projections; a PDE–2028 General Fund Budget Approval; job qualifications for proposed staff positions and a professional development plan; the address and physical description of the proposed site; and its curriculum.

2. Initially, ICS intends to provide instruction for students for grades K–6.

3. Act of March 10, 1949, P.L. 30, *as amended*, added by the Act of June 19, 1997, P.L. 225, *as amended*, 24 P.S. §§ 17–1701 A—17–1751–A.

4. The CDSD provides public education for approximately 11,700 school-age children, of whom approximately 5,800 are elementary age. The CDSD offers a mentally-gifted education program for its students in accordance with the regulations of the Pennsylvania Department of Education.

5. Section 1717–A(i)(2) of the Law, 24 P.S. § 17–1717–A(i)(2), requires an applicant who wishes to appeal the denial of a charter by a local board of school directors to obtain the

The Board reviewed the record and additional information and documents submitted for review by stipulation of the parties. The Board also heard oral argument on October 24, 2002. The Board reversed the CDSD and granted the charter school application. The Board made the following relevant findings of fact:

12. The purpose of ICS is to operate a charter school that will provide an educational option for gifted students....

13. ICS will accept any student regardless of intellectual ability and there is no educational screening that is completed in conjunction with enrollment....

14. ICS is prepared to address the needs of non-gifted or disabled students that might enroll in the charter school....

15. There is sustainable support for ICS from the community, parents, teachers and students....

16. ICS has provided sufficient information relating to its proposed facility and site for its charter school....

17. CDSD denial of ICS's application provided insufficient specific reasons for its denial based upon its review of ICS's financial plan....

18. The financial plan demonstrates that ICS has considered fundamental budgeting issues and sufficient funds will be available to operate the charter school....

. . . .

20. ICS would act as a model for other public schools and will provide educational opportunities that differ from those currently provided by CDSD....

21. ICS provided sufficient information relating to its proposed faculty and staff.... (Citations omitted).

State Charter School Appeal Board, Decision, December 16, 2002, (Decision) Findings of Fact Nos. 12–18, and 20–21 at 4–5.

The Board determined that ICS did not discriminate because it sought to meet the needs of gifted children. The Board also determined that ICS demonstrated sustainable support, that ICS provided sufficient information regarding the proposed location of the school, that ICS established a satisfactory plan to meet the financial needs of the school, that the CDSD erred when it denied the application on the basis that the ICS proposal failed to provide opportunities not readily available to CDSD students, that ICS was not required to file a regional charter application, and that ICS's failure to include the specific names and clearances for the proposed faculty and staff was not fatal to the application.

On appeal, CDSD contends that the Board erred because it concluded that ICS did not discriminate in its admission practices, that ICS failed to provide substantial evidence of sustainable support, a viable financial plan, and an appropriate physical facility, that ICS failed to include required information such as faculty, a professional development plan, criminal history records, official clearance statements and a curriculum for non-academically gifted children, and that the Board further erred when it concluded that the proposed charter school was consistent with legislative intent.[6]

signatures of at least two percent of the residents of the school district or of 1,000 residents, whichever is less, who are over eighteen years old.

6. Because the Board properly conducted a *de novo* review of CDSD's decision it permitted ICS to present additional evidence not presented before CDSD, this Court will review the Board's adjudication to determine if it violated constitutional rights, was not in accordance with the law, or was not supported by substantial evidence. *School District of*

## I. Discrimination on the Basis of Intellectual Ability.

■ CDSD contends that the Board erred when it concluded that ICS did not discriminate on the basis of intellectual ability. CDSD asserts that ICS practices discrimination in its marketing, its application form, and its practice of counseling parents of non-gifted students.

Section 1723–A(b) of the Law, 24 P.S. § 17–1723–A(b), provides in pertinent part:

(b)(1) A charter school shall not discriminate in its admission policies or practices on the basis of intellectual ability, except as provided in paragraph (2), or athletic ability, measures of achievement or aptitude, status as a person with a disability, proficiency in the English language or any other basis that would be illegal if used by a school district.

(2) A charter school may limit admission to a particular grade level, a targeted population group composed of at-risk students, or areas of concentration of the school such as mathematics, science or the arts. A charter school may establish reasonable criteria to evaluate prospective students which shall be outlined in the school's charter.

The Board determined:

Although the clear language of the Charter School Law prohibits charter schools from using intellectual ability as an admission criteria (unless otherwise permitted by Section 17–1723–A(b)(2) (24 P.S. § 17–1723–A(b)(2)), ICS's marketing of its charter school towards, and focus on, mentally gifted students is not necessarily a violation of Section 1723–A(b)(1) of the Law. ICS employs no screening devices in the enrollment of its students, and it will accept any student, regardless of the student's intellec-

tual ability or mental aptitude.... In fact, part of ICS's proposed budget includes funding for a learning specialist who would address the uneven development of students who would attend the school. Moreover, the school appears to anticipate having special needs students or students with learning disabilities because it has consulted with the Capital Area Intermediate Unit regarding contracting for services for such students. Therefore, because students are to be enrolled into ICS without regard to intellectual ability, there does not appear to be any 'de jure' intellectual ability discrimination, which would violate Section 1723–A(b)(1).

Nor does there appear to be any 'de facto' discrimination in ICS's enrollment policies and practices. The fact that ICS would be suited for students of a higher intellectual ability does not run afoul of Section 1723–A(b)(1). Although ICS would focus its curriculum on gifted student programs and, as a consequence, gifted students might more likely be attracted to ICS than students of a lower academic ability, this does not amount to de facto discrimination. Any student is permitted to attend ICS, and ICS seems to be more than adequately prepared to address the needs of non-gifted students.... Therefore, the CAB [Board] finds that there would be no violation of Section 1723–A(b)(1) in ICS's proposed operation of its charter school.

Furthermore, ICS's goals are consistent with the stated legislative intent of the Charter School Law, which is to increase learning opportunities for all pupils, encourage the use of different and innovative teaching methods, and to provide parents and students with expanded choices in the types of educational

*the City of York v. Lincoln–Edison Charter* *School,* 798 A.2d 295 (Pa.Cmwlth.2002).

opportunities that are available within the public school system.... The unique educational opportunities offered by ICS would be available to all students without consideration of their intellectual ability in the enrollment process, even though not all such students would thrive at the charter school. The fact that all students would not thrive at ICS does not constitute discrimination as envisioned by Section 1723–A(b)(2). Therefore, the CAB [Board] finds that CDSD improperly denied ICS's application for a charter pursuant to that provision of the Charter School Law. (Citations omitted).

Decision at 11–12.

Unquestionably, ICS targets mentally-gifted children. However, ICS stated in the admission policy section of its application that it will not discriminate in admissions, and that a lottery will be held if applications exceed openings. The Board determined that there was no *de jure* discrimination which would violate Section 1723–A(b)(1) of the Law because students were to be enrolled without regard to intellectual ability. This Court agrees.

This Court is aware that a mere declaration of intent may not be used as a defense for actual discrimination. *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 4 Pa.Cmwlth. 448, 287 A.2d 161 (1972), *affirmed by, Pittsburgh Press Company v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). There was no evidence of record that ICS would practice discrimination in its enrollment practices. Under Section 1723–A(b)(2) of the Law, 24 P.S. § 17–1723–A(b)(2), a charter school is permitted to limit admission to areas of concentration such as mathematics, science, or the arts. ICS clearly stated its intention to develop a curriculum for mentally gifted students.

However, all applicants would be eligible to participate in this curriculum. The Board determined that such an admission policy did not constitute a violation of Section 1723–A(b)(2). This Court agrees.

## II. Sustainable Support.

The CDSD next contends that the Board erred when it determined that ICS provided substantial evidence of sustainable support for its proposed school. Under Section 1717–A(e)(2)(i) of the Law, 24 P.S. § 17–1717–A(e)(2)(i), a proposed charter school operation must be evaluated on "[t]he demonstrated, sustainable support for the charter school plan by teachers, parents, other community members and students, including comments received at the public hearing held under subsection (d)."

CDSD asserts that ICS failed to meet this requirement because at the hearing before CDSD only two students and twenty parents spoke in favor of the proposed school and three of those parents were founding members or board members and several were husband and wife. In the public meetings and at the hearing CDSD argues ICS failed to present any letters of intent to enroll. Even before the Board, CDSD asserts ICS presented letters of intent from only sixteen students of the targeted enrollment of 120. CDSD also asserts that there was no support from teachers or other community members.

This Court has determined that the emphasis of Section 1717–A(e)(2)(i) is on "the applicant showing that the charter school enjoys reasonably sufficient support from the community, not showing some minimum level of support from each of the more discrete groups listed." *Brackbill v. Ron Brown Charter School*, 777 A.2d 131, 138 (Pa.Cmwlth.2001), *petition for allow-*

*ance of appeal denied,* 573 Pa. 673, 821 A.2d 588 (2003).

Here, the Board determined:

In this case, the demonstrated support for ICS, when considered in the aggregate, is sufficient to reverse the CDSD's denial of the charter application. Although there is some dispute between the parties relating to the exact number of letters of support, letters of intent to enroll, or speakers at the hearings below, the record below demonstrates that substantial support has been exhibited for the charter school.... At the very least, the parents of more than ninety children have expressed a direct interest in enrolling their children in ICS. Additionally, there were more than twenty separate and unique persons that spoke at the public hearings below offering support for ICS, and these speakers represented parents, students and teachers.... Although the record does contain letters opposing the charter school, they are irrelevant to the CAB's [Board] consideration of whether there is sustainable support for ICS.... Taken as a whole, the record below and the supplemental information submitted by stipulation of the parties clearly demonstrate that there is sufficient sustainable support for ICS pursuant to Section 1717–A(e) of the Charter School Law. (Citations omitted).

Decision at 13. This Court agrees that ICS provided evidence of sustainable support.

### III. *Evidence of Financial Plan.*

 CDSD argues that ICS failed to present a financial plan that showed it was capable of providing the comprehensive learning experience it proposes to offer. Section 1717–A(e)(2)(ii) of the Law, 24 P.S. § 17–1717–A(e)(2)(ii), requires an applicant to demonstrate that it is capable of provid-

ing the comprehensive learning experience it proposes. Section 1719–A(9) of the Law, 24 P.S. § 17–1719–A(9), provides that an application to establish a charter school must include a financial plan that provides for a proper audit of the school. CDSD asserts that ICS's financial plan required an enrollment of 120 students to produce sufficient revenue to meet expenses but that only sixteen students were committed, far fewer than the eighty percent of 120, which was ICS's stated need. CDSD also asserts that the plan was inadequate because there was no money dedicated for physical education, the teacher salaries were too low, and it budgeted an inadequate amount for computers and art supplies.

The Board determined:

The financial plan was developed by the interim business manager for the charter school, who has over 25 years of experience in project management, budget preparation and financial accounting for large construction projects.... This information includes a detailed summary of the revenue that would be generated by the school and the expenditures the school would make.... Additional budgetary information was submitted to CDSD on September 13, 2001, which included cash flow projections and additional financial information....

... Based upon the CAB's [Board] review of ICS's financial plan and budget information submitted to CDSD, it appears that the financial plan provides a sufficient basis from which the CAB [Board] can conclude that ICS has considered fundamental budgeting issues and sufficient funds will be available to operate the charter school. (Citations omitted).

Decision at 15–16.

Section 1717–A(e)(2)(ii) of the Law, 24 P.S. § 17–1717–A(e)(2)(ii), provides that a

local board of school directors shall evaluate a charter school application based on "[t]he capability of the charter school applicant, in terms of support and planning, to provide comprehensive learning experiences to students pursuant to the adopted charter." Section 1719-A(9) of the Law, 24 P.S. § 17-1719-A(9), provides that an application to establish a charter school shall include "[t]he financial plan for the charter school and the provisions which will be made for auditing the school under section 437...."

Here, when it denied the application, the CDSD stated:

> There is insufficient financial support for the school, insufficient evidence that the enrollment will be sufficient to reach the break-even point for the budget, and the anticipated revenues are insufficient to demonstrate that the school can successfully fund its operations. Lease costs are not complete. Other expenses are not realistic for the proposed operation.

Notice of Denial of Charter Application, November 21, 2001, at 2-3.

When the Board conducted a *de novo* review of the application, it determined that ICS's financial plan satisfied the requirements of the Law. Although CDSD asserts that the plan was inadequate because there was no money dedicated for physical education, the teacher salaries were too low, and it budgeted an inadequate amount for computers and art supplies [7], the Law does not require such specifics in the budget as long as the school board or upon appeal the Board can determine that the applicant is capable of providing a comprehensive learning experience for students.

7. When it denied the charter application, CDSD did not list these reasons when it stat-

This Court agrees there was sufficient evidence for the Board to conclude that ICS's financial plan complied with the applicable provisions of the Law.

### IV. Appropriate Physical Facility.

■ CDSD next contends that ICS failed to establish that it had an appropriate physical facility for its proposed charter school. Under Section 1719-A(11) of the Law, 24 P.S. § 17-1719-A(11), an applicant must submit a description of the physical facility in which it plans to locate its school, its address, the ownership of the facility and the lease arrangements. From this description, a school board or the Board determines whether the physical facility is adequate for the proposed school's needs. CDSD argues that ICS failed to appropriately describe its proposed facility because it did not provide the dimensions of its classrooms, the proposed facility has no cafeteria or multi-purpose room, no physical education area, and no nurse's office. Further, CDSD asserts that ICS provided no information regarding lavatory facilities, fire exits, handicapped accessibility, or heating, ventilation, air conditioning, or electrical service.

> On this issue, the Board determined:
> Section 1719-A of the Law sets forth the requirements for the contents of the charter application, which is to include a description and address of the physical facility for the location of the charter school, as well as a description of any ownership interest or lease arrangement that school may have in the site....
> The Charter School Law does not require that a charter applicant actually secure the proposed property or provide the school district with a lease or sales agreement, site development plan or a

ed that the financial plan was inadequate.

list of alternative sites.... In fact, the CAB [Board] has previously approved a charter where all that was available was a street address and drawing of the proposed facility, and the applicant needed to secure a zoning variance in order to operate a school in the proposed facility....

ICS included in its charter application a detailed description of the potential site for the school, including the site's address and an expression of its intent to lease the site from its current owner.... In addition, on November 21, 2001, the landlord for the proposed site provided ICS with a detailed letter relating its intent to lease the physical facility to ICS.... Although the letter is not binding on either the landlord or ICS, it does state unequivocally, that the premises would not be offered to other potential lessees until after May 31, 2002, provided that CDSD awards a charter to ICS.... Based upon this information, the record contains sufficient information relating to ICS's proposed facility for the charter school, thereby warranting the CAB's [Board] reversal of CDSD's decision to deny ICS's charter application under Sections 1717–A(e)(2) and 1719–A(11) of the Charter School Law. (Citations omitted).

Decision at 14–15.

Section 1719–A(11) of the Law, 24 P.S. § 17–1719–A(11) provides that an application to establish a charter school shall include "[a] description of and address of the physical facility in which the charter school will be located and the ownership thereof and any lease arrangements."

Here, the Board was satisfied that ICS substantially complied with the Law. While CDSD asserts that ICS failed to appropri-

ately describe the facility because it didn't provide the dimensions of the classrooms, no nurse's office was listed, and other such specifics, it appears that CDSD requires more than the General Assembly set forth in the Law. Section 1719–A requires a description and address of the physical facility. The Board determined that ICS complied with the requirement because it provided a detailed description of the proposed facility.

This Court agrees with the Board that ICS substantially complied with the Law. There was no requirement that ICS provide such detailed information as CDSD required.

### V. Failure to Provide Necessary Information.

■ CDSD next argues that ICS failed to include information in its application required under the Law such as faculty, a professional development plan, criminal history records, and official clearance statements.[8]

Section 1719–A(13),(15), and (16) of the Law, 24 P.S. § 17–1719–A(13),(15), and (16) provide that an applicant must include the proposed faculty and the professional development plan for the faculty, a report of criminal history record for all individuals who shall have direct contact with students, and an official clearance statement regarding child injury or abuse from the Pennsylvania Department of Public Welfare for all individuals who will have direct contact with students.

CDSD asserts that ICS did not provide this information with the exception of a couple of key individuals. Because the Law requires that this information be included in the application, and it was not,

---

8. The CDSD did not raise the issue of the curriculum for the non-academically gifted children when it denied the charter applica-

tion. This issue is not preserved for our review. See Pa.R.A.P. 1551(a).

CDSD argues that ICS's application must be denied.

With respect to this issue, the Board determined:

> The final basis for CDSD's denial of ICS's charter application was the district's assertion that ICS failed to sufficiently identify proposed faculty and staff for the charter school, and failed to include the required reports and clearances for such faculty and staff with its application materials. However, although ICS's application did not include the specific names and clearance for the charter school faculty staff, it did include an identification of the job qualifications for the various staff positions for the proposed school.... Because a charter school has not yet been established when an applicant seeks a charter, it is unreasonable and unrealistic to expect the charter application to contain the specific names and clearances for all proposed faculty and staff positions.... [T]he approach taken by ICS in its application was appropriate and compliant with the Law. Therefore, ICS's failure to provide specific names and clearances for the school's faculty and staff was not a proper basis for CDSD's denial of its charter application. (Citations omitted).

Decision at 18.

This Court agrees with the Board that ICS did everything that could reasonably

be done to include this information in its application.

## VI. Failure to Achieve Law's Objectives.

■ Finally, Section 1717–A(e)(2)(iii) of the Law, 24 P.S. § 17–1717–A(e)(2)(iii), provides that the local school board should evaluate a proposed charter school application on the basis of whether the application conforms to the legislative intent set forth in Section 1702–A of the Law, 24 P.S. § 17–1702–A.[9] CDSD asserts that the Board erred when it concluded that ICS satisfied the legislative intent set forth in the Law. CDSD asserts that it already has a program for gifted students and uses differentiated learning for gifted students with additional time out of the regular classroom. If ICS accepts non-gifted students it will have to provide differentiated programs as well. Also, CDSD asserts there was no evidence that ICS will improve pupil learning, increase learning opportunities for all pupils, or innovate new teaching methods.

The Board disagreed and reasoned:

> The Law requires a school district to evaluate a charter application by considering the extent to which the charter school would serve as a model for other public schools.... However, the CAB [Board] has held that the existence of similar programs in the school district does not prove fatal to a consideration of

---

9. Section 1702–A provides:

> It is the intent of the General Assembly, in enacting this article, to provide opportunities for teachers, parents, ... pupils and community members to establish and maintain schools that operate independently from the existing school district structure as a method to accomplish all of the following:
> (1) Improve pupil learning.
> (2) Increase learning opportunities for all pupils.
> (3) Encourage the use of different and innovative teaching methods.

> (4) Create new professional opportunities for teachers, including the opportunity to be responsible for the learning program at the school site.
> (5) Provide parents and pupils with expanded choices in the types of educational opportunities that are available within the public school system.
> (6) Hold the schools established under this act accountable for meeting measurable academic standards and provide the school with a method to establish accountability systems. (Footnote omitted).

whether a charter school can serve as a model for other public schools pursuant to Section 1717–A(e) of the Law.... Therefore, the fact that CDSD already has a program for gifted students is irrelevant to the consideration of whether ICS would serve as a model for other public schools. Further, ICS would provide an educational program for gifted students that is innovative and distinctive from CDSD. The record is replete with differences between the program offered by ICS and CDSD's existing gifted student program.... Therefore, the CAB [Board] finds that CDSD improperly denied ICS's charter on the grounds that the charter school would not offer educational opportunities that are not readily available to students in the school district. (Citations omitted).

Decision at 17. This Court agrees.

Accordingly, we affirm.

### ORDER

AND NOW, this 15th day of April, 2004, the order of the State Charter School Appeal Board in the above-captioned matter is affirmed.

---

1. That section provides:

 **Enrollment**

 * * *

 (b)(1) A charter school shall not discriminate in its admission policies or practices on the basis of intellectual ability, except as provided in paragraph (2) ...
 (2) A charter school may limit admission to a particular grade level, a targeted population group composed of at-risk students, or areas of concentration of the school such as mathematics, science or the arts. A charter school may establish reasonable criteria to evaluate prospective students which shall be outlined in the school's charter.
 24 P.S. § 17–1723–A(b).

2. Included in the Application and its supporting documents were, *inter alia*, the following:

### DISSENTING OPINION BY JUDGE PELLEGRINI.

I respectfully dissent because Infinity Charter School's (Infinity) application for a school charter for mentally-gifted students impermissibly discriminates by its announced purpose and through marketing and admissions practices to have a charter school for intellectually-gifted students in violation of Section 1723–A(b) of the Charter School Law (CSL), Act of March 10, 1949, P.L. 30, *as amended, added by* the Act of June 19, 1997, P.L. 225, *as amended,* 24 P.S. § 17–1723–A(b).[1]

On July 30, 2001, Infinity filed an application for a charter (Application)[2] with Central Dauphin School District (Central Dauphin), seeking to operate a charter school that would serve students in grades K–12 within the school district pursuant to the CSL with the specified purposed of providing an educational option for mentally-gifted students.[3] Infinity maintained that a curriculum geared for mentally-gifted students should be different from a curriculum geared for other children in order to maximize their potential. While enrollment in the charter school would remain open to any student whose parents

---

letters of support; newspaper articles; 85 pre-enrollments containing the names of 59 residents of the school district; a Summary of Revenue and Expenditures; Cash Flow Projections; a PDE–2028 General Fund Budget Approval; job qualifications for proposed staff positions and a professional development plan; the address and physical description of the site where the charter school would be operated by Penbrook United Church of Christ (Penbrook Church); and a description of its curriculum.

3. Central Dauphin provides public education for approximately 11,700 school-age children, of whom approximately 5,800 are elementary age, as well as offering a mentally-gifted education program for its students in accordance with regulations of the Pennsylvania Department of Education.

wanted them to attend, throughout the process, Infinity emphasized that the proposed charter school was for mentally-gifted students.[4]

Central Dauphin denied Infinity's Application because, *inter alia*,[5] the proposed charter school would impermissibly discriminate on the basis of intellectual ability or aptitude in violation of Section 1723–A(b) of the CSL, 24 P.S. § 17–1723–A. Infinity appealed to the State Charter School Appeal Board (CAB), which reversed, finding that Infinity's proposed charter school would not discriminate on the basis of intellectual ability. Affirming CAB's decision, the majority concludes, *inter alia*, that Infinity's proposed charter school did not violate Section 1723–A(b). In so holding, the majority admits that it is unquestionable that Infinity targets mentally-gifted children; however, it states that because Infinity has publicized a non-discriminatory admission policy, there is no discrimination in violation of Section 1723–A(b)(2). I disagree because the record clearly demonstrates that Infinity's proposed charter school seeks to attract and matriculate students who are mentally-gifted.

Although Infinity has an announced policy stating that it will not discriminate, announced policies can be a subterfuge or they can be supplanted by informal policies, patterns or practices that have the net effect of unlawfully discriminating, whether that be done intentionally or unintentionally. In *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 4 Pa.Cmwlth. 448, 287 A.2d 161 (1972), *affirmed by Pittsburgh Press Company v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973), a newspaper advertised jobs under the headings "Jobs—Female Interest," "Jobs—Male Interest," and "Male—Female Help." However, at the beginning of each heading, the paper placed a disclaimer stating that the designations were done for the convenience of the readers, but that "various laws and ordinances—local, state and federal, prohibit discrimination in employment because of sex ... [and that] the job seekers should assume that the advertiser will consider applicants of either sex in compliance with the laws against discrimination." *Pittsburgh Press*, 287 A.2d at 165. Holding that the disclaimer did not exculpate the newspaper from gender discrimination, we stated that "[w]e have long passed that point ... whereby a declaration of intent can be used as a screen or defense for actual discrimination." *Pittsburgh Press*, 287 A.2d at 168.

Similarly, in this case, Infinity's marketing makes clear that the target student is mentally-gifted. Its "PowerPoint" presentation at the public hearings before Central Dauphin only focused on gifted students. For instance, on the first slide,

---

4. Infinity's announced admission policies do not facially discriminate on the basis of intellectual ability. In its Application, under Section IX. 2 titled "Admission Policy," Infinity stated that it "will not discriminate in admissions decisions." (Petitioner's Appendix # 4 at 6).

5. Central Dauphin also denied the Application because Infinity failed to: 1) demonstrate sustainable support for the charter school; 2) provide sufficient information describing the proposed site and physical location for the charter school; 3) establish a satisfactory plan or demonstrate any ability to meet the financial needs of the charter school; 4) establish that it would be a model for other public schools and provide opportunities not readily available to students in the school district; and 5) failed to identify proposed faculty and staff or to include required reports and clearances with its application materials. In addition, Central Dauphin also denied the Application because it should have been filed as a regional charter school.

titled "Summary," Infinity stated that the presentation was for "[p]arents of [Central Dauphin] gifted students" and that the charter school's purpose was to "provide another public education option to meet the needs of mentally gifted students." (Reproduced Record at 233a). Infinity's mission statement is to create a charter school "that addresses the intellectual, academic and social-emotional needs of mentally gifted children." *Id.* Except for one sentence, where Infinity states that it "will not discriminate in the admissions process," (Reproduced Record at 240a), the entire PowerPoint follows a constant theme of exclusivity for mentally-gifted students. *Nowhere* in the presentation does Infinity state that it *will accept* students of all intellectual ability, *nor* does its statement that it will not discriminate in the admissions process make clear that it also applies to intellectual ability as opposed to only the constitutionally-protected classes of race, creed, color, gender, national origin, ancestry or disability.[6]

The net effect of Infinity's marketing is "discrimination" on the basis of intellectual ability by marketing and catering to intellectually-gifted students and by pushing away other students. This marketing practice frustrates the purpose of the CSL and circumvents the prohibition against intellectual discrimination in Section 1723–

A of the CSL. Infinity's hollow representation that it will accept anyone other than gifted children makes the school's purpose, as set forth in its application, a sham and its marketing, a "bait and switch" pitch. Because Infinity's marketing and admissions practices are designed to generate applications for admission from only intellectually-gifted students, CAB erred in finding that Infinity did not discriminate based on intellectual ability.

Accordingly, because Section 1723–A(b) of the CSL was added by the General Assembly because "we do not want to create elitist schools, special schools. We want to create an opportunity for all our boys and girls to learn,"[7] I respectfully dissent.

Judges SMITH–RIBNER and COHN join.

---

6. Other examples of Infinity's marketing include: (1) a press release notifying the public of "an information meeting to discuss a charter school for elementary-age gifted pupils," (Petitioner's Appendix # 5); (2) a flyer titled "A Charter School for Gifted Students" listing informational meetings to discuss a "public charter school to meet the intellectual, academic and socio-emotional needs of gifted students," *Id.;* (3) a Frequently Asked Questions (FAQ) regarding Infinity stating that the special focus of the charter school is "to meet the needs of intellectually and/or academically gifted children," *Id.;* and (4) an FAQ explaining "Gifted Education" and the impor-

tance of removing gifted children from the regular classrooms and placing them with other gifted students. Like the PowerPoint presentation, none of these marketing tools attempted to inform the parents in the Central Dauphin School District that students of all intellectual ability would be accepted; in fact, the language used throughout the literature, "Infinity Charter School for Gifted Students," implied the contrary.

7. Legislative Journal–Senate, June 11, 1997, p. 765.