Vision Academy Charter School : 
of Excellence, : 
                Petitioner : 
                : 
          v. : 
                : 
Southeast Delco School District : 
(Charter School Appeal Board), :    No. 46 C.D. 2022
                Respondent :    Submitted: October 28, 2022


BEFORE:    HONORABLE ANNE E. COVEY, Judge
                HONORABLE ELLEN CEISLER, Judge
                HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                             FILED: March 30, 2023

        Vision Academy Charter School of Excellence (Charter School) petitions this Court for review of the Charter School Appeal Board's (CAB) December 17, 2021 order affirming the Southeast Delco School District's (District) decision that denied its charter. The Charter School presents fives issues for this Court's review: (1) whether CAB erred by determining that the Charter School's revised charter application (Revised Application) did not satisfy the requirements of Section 1719-A of the Charter School Law (CSL);[1] (2) whether CAB erred by determining that the Revised Application did not demonstrate its capability, in terms of support and planning, to provide a comprehensive learning experience to students

---

[1] Act of March 10, 1949, P.L. 30, *as amended*, added by Section 1 of the Act of June 19, 1997, P.L. 225, 24 P.S. § 17-1719-A (relating to application contents).

pursuant to Section 1717-A(e)(2)(ii) of the CSL;[2] (3) whether CAB erred by determining that the Revised Application did not conform to the legislative intent outlined in Section 1702-A of the CSL;[3] (4) whether CAB erred by determining that the Revised Application failed to demonstrate that the Charter School may serve as a model for other public schools pursuant to Section 1717-A(e)(2)(iv) of the CSL;[4] and (5) whether CAB is estopped from denying the Revised Application. After review, this Court reverses and remands.

## Facts

On November 14, 2019, the Charter School filed an application with the District (Original Application) to open and operate a charter school pursuant to the CSL. On December 18, 2019, the District's Board of Directors (Board) held a public hearing on the Charter School's Original Application. The Board heard testimony from the Charter School and the District's administration. Pursuant to Section 1717-A(e)(2)(i) of the CSL, the Board also took public comments during the hearing regarding the Charter School's Original Application. Five people spoke during the public comment period. On February 27, 2020, the District voted to deny the Original Application. On March 6, 2020, the District issued an Opinion Supporting Denial.

On March 12, 2020, the Charter School incorporated as a domestic nonprofit nonstock corporation. On April 6, 2020, the Charter School filed its Revised Application with the District. The Revised Application added more curriculum, but was otherwise the same as its Original Application. No public hearing was held regarding the Charter School's Revised Application and, on May

---

[2] Added by Section 1 of the Act of June 19, 1997, P.L. 225, 24 P.S. § 17-1717-A (relating to charter school establishment).

[3] Added by Section 1 of the Act of June 19, 1997, P.L. 225, 24 P.S. § 17-1702-A.

[4] Added by Section 1 of the Act of June 19, 1997, P.L. 225, 24 P.S. § 17-1717-A(e)(2)(iv).

2

28, 2020, the District voted to deny the Charter School's Revised Application. In denying the Revised Application, the District issued written rulings setting forth its reasoning for the denial. On July 23, 2020, the Charter School filed an Emergency Petition to Certify Petition for Appeal (Petition) with the Delaware County Common Pleas Court (Common Pleas). The Charter School obtained the signatures of 1,425 qualified District residents over the age of 18, which exceeded the number of signatures required to qualify a charter school to pursue an appeal from a charter denial to CAB. On August 27, 2020, Common Pleas held a hearing on the Petition, which the District did not oppose. Also on August 27, 2020, Common Pleas certified the Petition and authorized the Charter School's appeal to CAB. On December 17, 2021, CAB affirmed the District's denial of the Charter School's Revised Application.[5] The Charter School appealed to this Court.[6]

## Discussion

### Section 1719-A(1), (8), (14), and (15) of the CSL

The Charter School first argues that CAB erred by determining that the Revised Application did not satisfy the requirements of Section 1719-A(1) (applicant identification); (8) (community group involvement); (14) (extracurricular activities); and (15) (criminal histories) of the CSL.

With respect to the Charter School's identification, CAB explained:

---

[5] CAB's order to affirm the District's denial of the Charter School's charter was based on CAB's October 17, 2021 vote, wherein three CAB members voted to deny the appeal and two CAB members voted to grant the appeal.

[6] "Our review of [CAB's] decision is limited to determining whether constitutional rights were violated, whether errors of law were committed or whether the decision is not supported by substantial evidence." *Propel Charter Schs. v. Sch. Dist. of Pittsburgh*, 271 A.3d 1, 6 n.9 (Pa. Cmwlth. 2021) (quoting *New Hope Acad. Charter Sch. v. Sch. Dist. of the City of York*, 89 A.3d 731, 736 (Pa. Cmwlth. 2014)).

> The applying entity did not exist at the time of the December 18, 2019 hearing. It was not created until March 12, 2020, according to the Pennsylvania Bureau of Corporations and Charitable Organizations [(Pennsylvania Corporation Bureau)]. This was after the [Original A]pplication[,] and only [after] the District identified the issue in the initial denial. Findings of Fact Nos. 1, 7, and 8. In the Revised Application, [the Charter School] identified the applicant as Vision Academy Charter School of Excellence. This contradiction calls into question who is in a position of control of the proposed Charter School. Charter schools are public schools and from that there is a strong affirmative duty of proactive candor owing to the public. That was not provided. The District was right to question this factor and [the Charter School] offered no adequate explanation. [The Charter School] failed on this factor.

CAB Dec. 17, 2021 Op. at 13.

The Charter School contends that the CSL does not prohibit, and in fact, expressly authorizes, an unincorporated nonprofit association to establish a charter school and that, at the time of the Original Application and public hearing, the Charter School existed as a legal entity recognized under Pennsylvania law in clear contrast to CAB's findings. Specifically, the Charter School asserts that it was an unincorporated nonprofit association when it filed the Original Application and when the public hearing was held, and cites Section 9112 of the Pennsylvania Uniform Unincorporated Nonprofit Association Law (Law)[7] to support its position. The Charter School declares that because an unincorporated nonprofit association is recognized as a legal entity in Pennsylvania that may own and dispose of property,[8] the Charter School existed when it filed the Original Application.

_____

[7] 15 Pa.C.S. § 9112 (An unincorporated nonprofit association consists of two or more individuals who are joined together for a limited nonprofit purpose. Such an agreement to join together may be "oral, in record form or implied from conduct for one or more common, nonprofit purposes.").

[8] *See* Section 9114(a) of the Law, 15 Pa.C.S. § 9114(a) (providing that a "nonprofit association is a legal entity distinct from its members and managers").

4

The District rejoins that, according to the Pennsylvania Corporation Bureau, the Charter School was created on March 12, 2020, and, thus, did not exist at the time of the December 18, 2019 hearing. The District maintains that, notwithstanding its concerns as to the Charter School's identity as expressed at the Board hearing, and in the District's denial of the Original Application, the Charter School offered no explanation, until the instant appeal, now claiming that the initial applicant was an unincorporated nonprofit association. The District asserts that because the Charter School did not raise this claim before the District or CAB, it cannot now raise it in this appeal, and cites *School District of Pittsburgh v. Provident Charter School for Children with Dyslexia*, 134 A.3d 128 (Pa. Cmwlth. 2016), to support its position.

> The *Provident Charter School* Court held:
>
> The [s]chool [d]istrict contends that [CAB's] adjudication did not account for the fact that "there is even less choice for students who would attend Provident [Charter School] than what students elsewhere in the [d]istrict enjoy." School District Brief at 37. There is no record evidence to substantiate this claim. The [s]chool [d]istrict did not supplement the record before [CAB] or provide any evidence about its programs. The [s]chool [d]istrict cannot now complain that [CAB] did not consider evidence not presented to it.

*Id.* at 143. Similarly, here, as evidenced by the record, the Charter School contends for the first time that CAB erred by concluding that the Charter School did not exist at the time of the Original Application because it was a legally recognized unincorporated nonprofit association that incorporated prior to submitting its Revised Application.

However, Section 1719-A of the CSL specifies: "**An application** to establish a charter school **shall include** all of the following information: (1) The **identification of the charter applicant**." 24 P.S. § 17-1719-A (emphasis added).

5

Thus, whether the Charter School, i.e., Vision Academy Charter School of Excellence, was an unincorporated nonprofit association or incorporated entity is of no moment. The Original Application, the Revised Application, and the hearing testimony reflected that the applicant was Vision Academy Charter School of Excellence. Any concerns that the Charter School could not be located in the Pennsylvania Corporation Bureau were alleviated by the Charter School's March 12, 2020 incorporation. Given the fact that the same named entity filed the Original Application and the Revised Application, the applicant's identity was clear. Accordingly, the Charter School satisfied the applicant identification requirement in Section 1719-A(1) of the CSL.

Relative to the CSL's community group involvement requirement, CAB described:

> Section 1719-A(8) of the CSL requires an application to include information on involvement of community groups. The District points out that the [Original] Application and Revised Application are silent on this issue. [The Charter School] responds by saying, ["][the Charter School] did not have any community groups involved in the planning process; therefore, none are identified in the [Revised] Application. There is no requirement under the [CSL] which would compel an applicant to identify community partnerships that do not yet exist.["] [Charter Sch. Br.] at [] 9.

> The interpretation offered by [the Charter School] acknowledges that it did not have specific, committed community partnerships as of submission and consideration of the [Original and Revised] Applications, however, it also acknowledges that it did not name certain organizations that it might approach upon grant of a charter. The CSL does require community groups to be "involved in the charter school planning process," but [the Charter School] seems to suggest that the language is not time-sensitive and community engagement must occur at some point in the planning process. However, without disclosure or identification in the application of specific,

6

committed community partners, or potential community partners, [the Charter School's] application is not compliant with the requirements, and the intent, of the CSL[,] 24 P.S. § 17-1719-A(8)[,] because such an interpretation would vitiate the pla[i]n language of the CSL and cannot be countenanced. CAB disagrees with an interpretation that CSL requirements cannot be met unless a charter is first obtained. [The Charter School] failed on this factor.

CAB Dec. 17, 2021 Op. at 14.

The Charter School argues that the CSL's plain language does not support CAB's interpretation that specific committed or potential community partners must be identified in the application. The Charter School further claims that the Revised Application included numerous references to potential community partners and involvement, specifically, the "tremendous community support and the collaboration of local university representatives" in connection with its proposed extended day program. Reproduced Record (R.R.) at 113a. The Charter School adds that Charter School founding member Dr. Anthony Mooring discussed the Charter School's community partnerships at the December 18, 2019 public hearing on the Original Application, stating in connection with the extended day program that the Charter School will work in community collaboration and will want to "work with local universities." R.R. at 31a. The Charter School further emphasizes that Vision Academy Charter School in William Penn School District's (Vision William Penn) parent teacher association (PTA) president Nicole Chanel explained at the public hearing that the PTA engages the school and community partners in fundraisers and other similar activities and programs, which is a model that the Charter School intends to follow.

The Charter School also stresses that the Revised Application provides that its "founders expect to have an active relationship with the community locally and more broadly in the region, reaching out for volunteers from local universities

7

and businesses for support in the Extended Day Program." R.R. at 150a-151a. To this end, the Charter School's "Board has established a Community Advisory Committee that is the official connection between the school and its broader community." R.R. at 151a. In the Charter School's early planning stages its founding members "reached out to a number of community organizations and community leaders . . . and intends on working to create a more defined collaborative relationship with [Vision William Penn] . . . as well as other Core Knowledge[9] schools in the Mid-Atlantic region." R.R. at 164a.

The Charter School proclaims that in Section III.1.D of the Revised Application, it states that the Charter School will involve community groups in the planning process by ensuring that "the community plays an important role in the development and implementation of this [charter] school [and] the Board has formally identified in its by-laws that there will be a Community Advisory Committee that will provide support to the [B]oard." R.R. at 164a; *see also* R.R. at 4192a. With respect to professional development opportunities, the Charter School declares that the Revised Application provides that the Charter School "will employ its university and community business connections in organizing workshops that will enrich staff experience." R.R. at 182a.

---

[9] Anthony Mooring, one of the Charter School's founders, explained Core Knowledge as follows:

> A challenging curriculum, we want to use a research[-]based Core Knowledge curriculum, curriculum. Now, we believe this will improve student achievement, mastery of information, and it builds on knowledge learned so the more they learn, the more they will continue to learn through this Core Knowledge curriculum.

> And this curriculum is not new, it's been proven and used before, uh, one of the places it was used is Newark Charter School. Newark Charter School curriculum is a melding, it met the Delaware standards.

R.R. at 25a.

Section 1719-A of the CSL mandates: "**An application** to establish a charter school **shall include** all of the following information: . . . (8) Information on **the manner in which community groups will be involved in the charter school planning process**." 24 P.S. § 17-1719-A (emphasis added). "[T]he applicant need only set forth the information mandated by the [CSL], i.e., information on how community groups **will** be involved in the planning process. [The Charter School's] [R]evised [A]pplication did so." *Provident Charter Sch.*, 134 A.3d at 138 (bold emphasis added; italic emphasis omitted). Accordingly, the Charter School met the community group involvement requirement in Section 1719-A(8) of the CSL.

Concerning extracurricular activities, CAB explicated:

> Section 1719-A(14) [of the CSL] requires an application to include information on extracurriculars, and, in particular, whether any agreements have been entered into or plans developed with the local school district regarding participation of the charter school students in extracurricular activities with the school district. The District points out that the [Original] Application and Revised Application are silent on this issue. On pages 12-13 in its brief [the Charter School] makes an argument, similar to its argument about community group engagement, about extracurriculars. Essentially, [the Charter School] is of the position that at the time of submission of the Original Application and Revised Application it was too early for that information to exist. Again, the pla[i]n wording of the statute requires something on this factor; thus, [the Charter School] should have put something forward. [The Charter School] failed on this factor.

CAB Dec. 17, 2021 Op. at 14-15.

The Charter School argues that the Revised Application expressly provides that "[t]here have not been extra[]curricular activities jointly planned with the [] [D]istrict yet. However, [the Charter School] will seek [every] opportunity to cooperate with [the] . . . District in regard to extracurricular activities." R.R. at 155a.

9

Section 1719-A of the CSL mandates, in relevant part: "**An application to establish a charter school shall include** all of the following information: . . . (14) **Whether any agreements have been entered into or plans developed** with the local school district regarding participation of the charter school students in extracurricular activities within the school district." 24 P.S. § 17-1719-A (emphasis added). Contrary to CAB's conclusion, the Charter School was not silent on this issue. Indeed, the Charter School was required to state **whether** it had entered into agreements or had developed plans regarding extracurricular activities, and the Charter School declared that it had not, as of that time. The Charter School provided the prescribed information. Accordingly, the Charter School satisfied the extracurricular activities requirement in Section 1719-A(14) of the CSL.

Regarding criminal histories, CAB stated:

Section 1719-A(15) [of the CSL] requires an application to include information on criminal background checks. The District points out that the [Original] Application and Revised Application are silent on this issue. Again, [the Charter School] says [sic] that it was too early for that information to exist. Again, the plain wording of the statute requires something on this factor; thus, [the Charter School] should have put something forward. [The Charter School] failed on this factor.

CAB Dec. 17, 2021 Op. at 15.

The Charter School argues that the Revised Application contained Appendix J, the Charter School's Personnel Handbook (Handbook), which specifies the requirements to be completed before employment commences, including, in relevant part, "Employee Background Check," which states "[a]ll employees must comply with state requirements such as, but not limited to, fingerprinting, . . . Child Abuse Index, and Criminal Record Statement." R.R. at 4217a. In addition, the Charter School states that although the Revised Application did not set forth the

10

Charter School faculty and staff names and clearances, it identified the job qualifications for the various Charter School faculty and staff positions. *See* R.R. at 184a-188a.

Section 1719-A of the CSL mandates: "**An application** to establish a charter school **shall include** all of the following information: . . . (15) **A report of criminal history record**, pursuant to [S]ection 111 [of the Public School Code of 1949],[10] **for all individuals who shall have direct contact with students**." 24 P.S. § 17-1719-A (emphasis added).

> Because a charter school has not yet been established when an applicant seeks a charter, it is unreasonable and unrealistic to expect the charter application to contain the specific names and clearances for all proposed faculty and staff positions. . . . [T]he approach taken by [the Charter School] in its application was appropriate and compliant with the [CSL]. Therefore, [the Charter School's] failure to provide specific names and clearances for the [Charter S]chool's faculty and staff was not a proper basis for [CAB's] denial of its [Revised A]pplication.

*Cent. Dauphin Sch. Dist. v. Foundling Coal. of the Infinity Charter Sch.*, 847 A.2d 195, 204 (Pa. Cmwlth. 2004) (quoting CAB Dec. at 18 (citations omitted)).[11] Accordingly, the Charter School has satisfied the criminal histories requirement in Section 1719-A(15) of the CSL.

**Section 1717-A(e)(2)(ii) of the CSL**

The Charter School next argues that CAB erred by determining that the Revised Application did not demonstrate its capability, in terms of support and

---

[10] Act of March 10, 1949, P.L. 30, *as amended*, added by Section 1 of the Act of July 1, 1985, P.L. 129, 24 PS. § 1-111 ("Criminal history of employes and prospective employes; conviction of [employes of] certain offenses.").

[11] The *Infinity Charter School* Court "agree[d] with [CAB] that [the charter school] did everything that could reasonably be done to include this information in its application." *Infinity Charter Sch.*, 847 A.2d at 204.

11

planning, to provide a comprehensive learning experience to students, including but not limited to, through its financial plan, its proposed facility, and its curriculum, pursuant to Section 1717-A(e)(2)(ii) of the CSL, as such conclusion is not supported by substantial evidence.

Section 1717-A(e)(2)(ii) of the CSL mandates that the Charter School establish: "The capability of the charter school applicant, in terms of support and planning, to provide comprehensive learning experiences to students pursuant to the adopted charter." 24 P.S. § 17-1717-A(e)(2)(ii).

Relative to the Charter School's financial plan, CAB determined:

> Review of the budgetary information submitted in the Original Application, and unchanged in the Revised Application, supports the District[,] as the information is not adequate to support a conclusion of a comprehensive learning experience. The [D]istrict rightly complains about a lack of information on startup/repayment costs, the source of legal costs, special education training, oversight and internal controls, overly optimistic salary assumptions, thin margin, and no reserve.

CAB Dec. 17, 2021 Op. at 17.

However, "the [CSL] does not require such specifics in the budget as long as the school board or[,] upon appeal[,] [CAB] can determine that the applicant is capable of providing a comprehensive learning experience for students." *McKeesport Area Sch. Dist. v. Propel Charter Sch. McKeesport*, 888 A.2d 912, 918 (Pa. Cmwlth. 2005) (quoting *Infinity Charter Sch.*, 847 A.2d at 202).

Here, the record evidence reveals that the Charter School hired Charter Choices to assist with its financial planning. Joseph Martin[12] testified that Charter Choices has "provide[d] financial management and back office services to schools around Pennsylvania[ . . .] over the past [15] years[.] [It has] supported over [50]

---

[12] Joseph Martin works with Charter Choices. *See* R.R. at 34a.

12

schools assisting them with back office support, and [it] provided [] the financial component support for th[e] [Original A]pplication."[13]  R.R. at 35a.  The financial budget included in the Revised Application sets forth, *inter alia*, projected revenue sources, including estimated state and federal aid, federal funds for child nutrition, and revenue from regular and special education, *see* R.R. at 199a, as well as projected operational expenses, including average teacher salaries, health and dental insurance, property and general liability insurance, and similar expenses, *see* R.R. at 4205a, and contracted services, including business, audit, legal, professional development, payroll, special education, and food services.  *See* R.R. at 4207a. There are also budgeted line items for transportation and similar services, books and equipment, and site costs, *see* R.R. at 4206a, and for personnel, including administration, instruction, aides, and similar positions.  *See* R.R. at 4206a.

In addition, the Revised Application provides for working capital and specifically sets forth that "the Business Manager's personnel shall provide assistance to the [Charter] School to seek a line of credit facility [sic] with a financial institution to be utilized to fund seasonal or other cash flow deficiencies" thus, squarely addressing and eliminating the District's and CAB's concerns regarding potential budget deficits.  R.R. at 173a.  Accordingly, this Court holds that substantial evidence does not support CAB's determination that the Revised Application failed to demonstrate the Charter School's capability, in terms of support and planning, to provide a comprehensive learning experience to students through its financial plan.

With respect to the Charter School's proposed facility, CAB concluded:

[The Charter School] is of the position that the District is attempting to demand more information than the CSL

---

[13] The financial component in the Revised Application is unchanged.  The public hearing was held before the Revised Application was submitted.

requires in connection with the proposed facility. As such, [the Charter School] does not further elaborate on this factor as part of the application process.

These arguments are akin to those put forth regarding community group engagement, extracurriculars, and background checks . . . i.e., there is no need to produce such information now. This, again, calls into question the application process and advances an interpretation that undermines efforts to have information provided by the applicant as part of the [application] process. Further, even if information is provided, (or that the District requires more information than the CSL requires)[,] the District openly and rightfully questions if the retail space at the facility could ever appropriately constitute educational space necessary for a school.

CAB Dec. 17, 2021 Op. at 18.

This Court has explained:

The CSL requires an applicant to provide "[a] description of and address of the physical facility in which the charter school will be located and the ownership thereof and any lease agreements." Section 1719-A(11) of the CSL, 24 P.S. § 17-1719-A(11). Further, under Section 1722-A(a) of the [CSL],[14] a charter school may be located on "space provided on a privately owned site, in a public building or in any other suitable location." 24 P.S. § 17-1722-A(a). A charter school facility must comply only with the public school regulations that concern health or safety of students. [*See*] Section 1722-A(b) of the CSL, 24 P.S. § 17-1722-A(b).

*Carbondale Area Sch. Dist. v. Fell Charter Sch.*, 829 A.2d 400, 408 (Pa. Cmwlth. 2003).

Here, in its Revised Application, the Charter School provided the Charter School's intended location, i.e., description and address, *see* R.R. at 173a, the identity of the building's ownership, and the Letter of Intent for Lease. *See* R.R. at 1415a. The Revised Application further included:

---

[14] Added by Section 1 of the Act of June 19, 1997, P.L. 225.

14

The building will fully comply with all [Americans With Disabilities Act of 1990 (]ADA[)[15]] and state and federal safety regulations.

The [Charter S]chool is fully committed to meeting all building code, life safety and accessibility requirements[,] and has taken the necessary preliminary steps to gain an idea of the scope and cost of the work that will be necessary to bring the building up to code and to ensure the safety of all of the students. The [Charter] School will take any additional measures above and beyond those required by code as requested to ensure the safety and welfare of all building occupants. [The Charter] School and site owners will execute a lease with options for renewal. The site owners will provide all of the finances and will do any fit-out required during the term of the lease. This will be repaid by the [Charter] School on a monthly basis during the first 5-year period. This projected amount has been included in the attached [5]-year proforma budget.

R.R. at 173a-174a.

[This Court] [dis]agree[s] with [] CAB that [the Charter School] [failed to] compl[y] with the requirements of the CSL. Although the additional information would be helpful in making a determination, it is not statutorily required. As we stated in *Brackbill* [*v. Ron Brown Charter School*, 777 A.2d 131 (Pa. Cmwlth. 2001)], "[a]lthough an applicant must include a proposed facility in its application, there is no requirement that the facility be under a contractual obligation before the charter is granted." *Id*. at 139.

*Carbondale Area Sch. Dist.*, 829 A.2d at 408. Accordingly, this Court holds that substantial evidence does not support CAB's determination that the Revised Application failed to demonstrate the Charter School's capability, in terms of support and planning, to provide a comprehensive learning experience to students through its proposed facility.

---

[15] 42 U.S.C. §§ 12101-12213.

Concerning the Charter School's curriculum, CAB stated:

> Although a charter school application is not required to "completely describe the content of the curriculum," it must be adequately described. *Appeal of Denial of Charter for Career Connections Charter Middle Sch*[.], (CAB No. 2006-03) [(]citing *In re: Pocono Mountain Mathematics* [&] *Tech*[.] *Charter Sch*[.], (CAB No. 2004-5)[)]. It seems that the District was reasonable in rejecting the [Original and Revised] Applications.

CAB Dec. 17, 2021 Op. at 20.

In its cover letter accompanying the Revised Application, the Charter School outlined the District's concerns regarding its curriculum, including, *inter alia*: the Spanish curriculum is unnecessary because it is not the most prominent language in the District; contracting for disabled student services is insufficient; the Charter School did not adequately discuss positive behavior support, discipline of special education students, least restrictive environment, state and local assessment, restraint, and seclusion; and the curriculum and textbooks do not align with current Pennsylvania core standards. *See* R.R. at 99a.

> The Charter School responded:

> The Revised Application identifies a robust and thorough recitation of the curriculum's alignment with the [Pennsylvania (]PA[)] [Safety and Security ] Curriculum Framework, PA Core Standards and PA Academic Standards. Indeed, the [Original] Application was also clear that the curriculum is aligned to current state standards. It provides details and examples of the coursework that will be provided to its students and thoroughly identifies the offerings for these areas of the curriculum.

> With respect to the [] Board's findings related to [the Charter School's] Spanish curriculum, [the Charter School] does not claim that Spanish is the most spoken foreign language in the [D]istrict. Rather, [it] [is] proposing to teach a world language, starting in

16

kindergarten, that meets the state requirements for teaching world languages. The [Original] Application clearly identifies that its world languages curriculum will align with the American Council on the Teaching of Foreign Languages [] standards and World-Readiness Standards for Learning Languages and satisfy the requirements provided under [PA] law for the teaching of world languages.

R.R. at 99a-100a.

The Charter School expounded:

With regard to the [] Board's concerns with [English Language Learners (]ELL[)] and the statistics provided, the [] Board does not provide us with any evidence that they [sic] estimated large concentration of 3% of District [s]tudents being an [ELL] is actually a smaller percentage. The information contained in [the Original] Application is public information obtained from Future Ready PA[16] and is reliable. A 3% ELL population, as in the District, is a considerably large percentage.

. . . .

With regard to the [] Board's concerns regarding special education services, the Revised Application will [sic] include all provisions that are consistent with [PA] law, federal law and regulations, including revising and adding provisions to identify the plan for [sic] to include students receiving special education services in the regular education program, where appropriate, and consistent with [PA] law. Our policies regarding Positive Behavior Support, discipline of special education students, the least restrictive environment, state and local assessments and restraints and seclusion are fully addressed in the Revised Application. Curriculum mapping has been adjusted in the Revised Application to indicate full alignment with the current [PA] standards.

Further, our curriculum for English learners with disabilities, provided in the [Original] Application, shows

---

[16] "The Future Ready PA Index [(Index)] is a collection of school progress measures related to school and student success. The Index includes a range of assessment, on-track, and readiness indicators, to more accurately report student learning, growth, and success in the classroom and beyond." https://www.futurereadypa.org (last visited Mar. 29, 2023).

that all English learners with disabilities are eligible for special education services which will comply with all state and federal laws and regulations. The [Original] Application also demonstrates that [the Charter School] will comply with the [Individuals with Disabilities Education Act],[17] [the National School of Public Administration and Local Government (]ESDDA[),[18] Section 504 [of the Rehabilitation Act of 1973],[19] [the] ADA, [the Family Educational Rights and Privacy Act],[20] the G[]askin Settlement [A]greement[21] and [title 22 of ] the Pennsylvania Code [(Education)]. [The Charter School] has demonstrated that it is committed to providing equal opportunity in formal education and extracurricular activities to students with disabilities.

R.R. at 100a-101a.

Indeed, in its Revised Application, the Charter School included Appendix B - Aligned Curriculum, which detailed curriculum frameworks aligned to PA Core Standards and Pacing Plans, PA ELL Standards, and PA academic standards. *See* R.R. at 482a-4123a. Accordingly, this Court holds that substantial evidence does not support CAB's determination that the Revised Application failed to demonstrate the Charter School's capability, in terms of support and planning, to provide a comprehensive learning experience to students through its curriculum.

In sum, the record evidence clearly reveals that the Charter School demonstrated its capability, in terms of support and planning, to provide a comprehensive learning experience to students through, *inter alia*, its financial plan,

---

[17] 20 U.S.C. §§ 1401-1487.

[18] The ESDDA "is the educational unit of the National Center of Public Administration and Local Government with the mission of training a body of specialized officials of the Public Administration with comprehensive professional training." www.ekdd.gr/en/the-school/esdda-profile/ (last visited Mar. 29, 2023).

[19] 29 U.S.C. § 794 (relating to nondiscrimination under federal grants and programs).

[20] 20 U.S.C. § 1232g.

[21] "The Gaskin Settlement Agreement is a formal resolution between the Pennsylvania Department of Education (PDE) and a group of families and advocacy organizations who had filed a class-action lawsuit against PDE on behalf of a group of children with disabilities in 1994." www.portageareasd.org/gaskinsagreement (last visited Mar. 29, 2023).

18

its proposed facility, and its curriculum. Accordingly, CAB erred by determining that the Revised Application failed to demonstrate its capability, in terms of support and planning, to provide a comprehensive learning experience to students through its financial plan, its proposed facility, and its curriculum in accordance with Section 1717-A(e)(2)(ii) of the CSL.

**Section 1702-A of the CSL**

The Charter School next argues that CAB erred by determining that the Revised Application did not conform to the legislative intent outlined in Section 1702-A of the CSL, which provides:

> It is the intent of the General Assembly, in enacting [the CSL], to provide opportunities for teachers, parents, pupils and community members to establish and maintain schools that operate independently from the existing school district structure as a method to accomplish all of the following:
>
> (1) Improve pupil learning.
>
> (2) Increase learning opportunities for all pupils.
>
> (3) Encourage the use of different and innovative teaching methods.
>
> (4) Create new professional opportunities for teachers, including the opportunity to be responsible for the learning program at the school site.
>
> (5) **Provide parents and pupils with expanded choices in the types of educational opportunities that are available within the public school system**.
>
> (6) Hold the schools established under [the CSL] accountable for meeting measurable academic standards and provide the school with a method to establish accountability systems.

24 P.S. § 17-1702-A (emphasis added).

> The legislative concept was to retain the charter schools' accountability to state and local authority[,] but afford charter schools the flexibility to provide an innovative and unique curriculum and to develop educational techniques that might serve as models for all public schools. To this end, the legislature relieved charter schools from having to follow many of the laws and regulations governing other public schools, in the hope that freeing charter schools to function without being hindered by these mandates would encourage innovation.

*W. Chester Area Sch. Dist. v. Collegium Charter Sch.*, 760 A.2d 452, 455 n.6 (Pa. Cmwlth. 2000), *aff'd*, 812 A.2d 1172 (Pa. 2002).

CAB concluded: "[T]he shortcomings of the proposed curriculum do not convince that [the Charter School] will improve pupil learning. **The main reason is want of new program**. There appears to be nothing new beyond the District's offerings and the offerings of [Vision William Penn]." CAB Dec. 17, 2021 Op. at 21-22 (emphasis added). However, the existence of similar programs in a school district does not prove fatal to a consideration of whether a charter school can serve as a model for other public schools pursuant to Section 1717-A(e) of the CSL. *See Infinity Charter Sch.* Accordingly, CAB erred by determining that the Revised Application did not conform to the legislative intent for its stated reason.

**Section 1717-A(e)(2)(iv) of the CSL**

The Charter School next argues that CAB erred by determining that the Revised Application failed to demonstrate that the Charter School may serve as a model for other public schools pursuant to Section 1717-A(e)(2)(iv) of the CSL.

Section 1717-A(e)(2)(iv) of the CSL mandates that the Charter School establish: "The extent to which the charter school may serve as a model for other public schools." 24 P.S. § 17-1717-A(e)(2)(iv).

Here, CAB concluded:

> The District evaluated [the Charter School's Original and Revised] Applications by the metric of the extent to which it will serve as a model for other public schools. [*See*] 24 P.S. § 17-1717-A(e)(2)(iv). CAB has reasoned that charter schools should improve public education. Given the discussion above: deficiencies in the application; lack of new program; inadequate facility; and, a limited financial plan, one can rightfully conclude that the proposed [charter] school would not be a model for other public schools, as required by the CSL. The District was right to do so here.

CAB Dec. 17, 2021 Op. at 22. Based on this Court's rulings above that substantial evidence does not support CAB's determinations and it is those same determinations upon which CAB concluded that the Charter School would not be a model for other public schools, there is no basis for CAB's ruling and this Court cannot conclude that the Charter School would not be a model school for other public schools. Accordingly, CAB erred by holding otherwise.

## Conclusion

CAB erred by determining that the Revised Application did not satisfy the requirements of Section 1719-A(1) (applicant identification); (8) (community group involvement); (14) (extracurricular activities); and (15) (criminal histories) of the CSL. Further, CAB's determination that the Revised Application did not demonstrate the Charter School's capability, in terms of support and planning, to provide a comprehensive learning experience to students through its financial plan, its proposed facility, and its curriculum, pursuant to Section 1717-A(e)(2)(ii) of the CSL, is not supported by substantial evidence. In addition, CAB erred by determining that the Revised Application did not conform to the legislative intent outlined in Section 1702-A of the CSL, and that the Revised Application failed to

21

demonstrate that the Charter School may serve as a model for other public schools pursuant to Section 1717-A(e)(2)(iv) of the CSL.[22]

Based on the foregoing, CAB's order is reversed and the matter is remanded to CAB to direct the District to issue the Charter School a charter.

_____
ANNE E. COVEY, Judge

---

[22] Based on the aforementioned dispositions, this Court does not reach the Charter School's remaining issue.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Vision Academy Charter School      :
of Excellence,      :
                Petitioner      :
     :
          v.      :
     :
Southeast Delco School District      :
(Charter School Appeal Board),      :     No. 46 C.D. 2022
                Respondent      :

## O R D E R

AND NOW, this 30th day of March, 2023, the Charter School Appeal Board's (CAB) December 17, 2021 order is REVERSED, and the matter is REMANDED to CAB to direct the Southeast Delco School District to issue Vision Academy Charter School of Excellence a charter.

Jurisdiction is relinquished.

_____

ANNE E. COVEY, Judge