Summit Charter School,          :
               Petitioner     :
                         :
       v.               :
                         :
Pocono Mountain School District  :
(Charter School Appeal Board),  :   No. 501 C.D. 2023
               Respondent   :   Argued: April 11, 2024

BEFORE:   HONORABLE ANNE E. COVEY, Judge
             HONORABLE CHRISTINE FIZZANO CANNON, Judge
             HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION
BY JUDGE FIZZANO CANNON        FILED: May 20, 2024

Summit Charter School (Summit) petitions for review from the April 22, 2023, order of the Charter School Appeal Board (Board), which affirmed the February 24, 2021, order of the Pocono Mountain School District Board of School Directors (District). The District's February 24, 2021, order denied Summit's third application for a school charter. Upon review, we affirm.

## I. Factual & Procedural Background

In November 2019, Summit filed its first charter application with the District. Board Op. at 1 (Certified Record (C.R.) #1). After public hearings, the District denied Summit's first application in February 2020. *Id.* In July 2020, Summit filed a revised application, which the District denied in September 2020. *Id.* at 2. In each instance, the District provided Summit with a report and an adjudication

explaining the basis for the denial. District Op. at 1-4 (C.R. #12).[1] In November 2020, Summit submitted its third application, which is the subject of this appeal. Board Op. at 2. The District held hearings on Summit's third application in December 2020 and February 2021. *Id.* After the February 2021 hearing, the District denied Summit's third application on February 24, 2021; it issued a written decision on June 3, 2022, which relied on an administrative report that the District compiled and presented as an exhibit at the February 2021 hearing. *Id.*; Supplemental Board Record at 3500-3595 (District Report).

Summit's founding group is comprised of individuals associated with Summit School of the Poconos, a private school that had been operating since the 2016-17 school year within the East Stroudsberg School District. District Op. at 7. As of the 2019-20 school year, the school had 74 students in grades K-10. *Id.* By February 2021, the school had 57 total students in mixed-age and mixed-grade level classes. *Id.* It had no special education program. *Id.* The school's leadership decided to transition the school to a charter school (Summit) and planned to open during the 2021-22 school year with 360 students. *Id.* at 8. After 10 years, the school hoped to serve 1300 students in grades K-12. *Id.* The school aimed to operate as a "democratic school community" with students having an "active voice" and sharing in the school's governance. *Id.* at 9-10.

The District noted that Summit had received substantive feedback after the first two applications, yet multiple deficiencies persisted in Summit's third application. Several of those deficiencies are relevant to this appeal. District Op. at 9-38.

---

[1] This Opinion references both the District's Report of February 4, 2021, and the District's subsequent Opinion of June 3, 2022.

2

The District concluded that Summit's application failed to demonstrate alignment with state curriculum standards, including those set forth in Chapter 4 of the School Code[2] regulations. *See* 22 Pa. Code § 4.12 (enumerating academic standards in multiple areas of study, including social studies, English, math, science, world languages, and arts and humanities). For instance, Summit proposed mixed-age grouping of students within grade levels, but the application did not explain how this approach would be implemented. The District stated: "Curriculum cannot be aligned to state standards and include the required course and assessment anchors in a mixed-grade grouping model." District Report at 6-7.

Summit's planned curriculum also failed to align with Pennsylvania's English Language Development (ELD) standards, which seek to ensure proficiency in all academic areas for second-language learners; these standards have specific targets that are determined by grade level and areas of study, including goals within math, science, and social studies.[3] District Report at 9. Concerning ELD instruction, Summit's application was specifically deficient (and in some instances non-existent) for certain areas of study. *Id*. at 9-10. The application also lacked any alignment to ELD standards for English Language Arts, "which is a Federal requirement in order to meet the needs" of English learners. *Id*. at 12. Also in English, the proposed curriculum failed to address or explain how it aligned with specific standards, including identifying sentences in the first grade, reading comprehension and

---

[2] The Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1-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 (School Code).

[3] "Standards for English Language Development," Pa. Dep't of Educ., July 13, 2017; https://www.stateboard.education.pa.gov/Documents/About%20the%20Board/Board%20Actions /2017/ELD%20Standards.pdf (last visited May 17, 2024).

contextualization in the seventh grade, and various types of writing skills (informative, explanatory, persuasive) in various grade levels. *Id*. at 15.

Regarding other curriculum subjects, Summit's application lacked any information concerning plans for civic knowledge assessments, which were required in public schools beginning with the 2020-21 school year pursuant to Act 35 of 2018,[4] which was enacted over a year before Summit submitted its first charter application. District Report at 11. In math, Summit's proposed curriculum failed to correlate with the state's Core and Keystone standards[5] in areas such as equations, graphs, and diagrams. *Id*. at 18-20. In fourth grade math, when the standards indicate that students learn multiplication and division, Summit's proposed curriculum failed to mention either of those required skills. *Id*. at 19. For example, the proposed curriculum for seventh grade math did not address standards requiring instruction in solving geometry problems involving images of squares and triangles; calculating area, height, and distance from word problems; and calculating triangle side lengths. *Id*. at 19. In eighth grade, the proposed curriculum did not address required standards requiring instruction in rational and irrational numbers, simplifying and solving algebra equations and functions, using slope and variables. *Id*.

In science, Summit's proposed curriculum failed to address (or even mention in some instances) Pennsylvania System of School Assessment (PSSA),

---

[4] Act of Jun. 19, 2018, P.L. 227, No. 35 Cl. 24.

[5] "Academic Standards for Mathematics," Pa. Dep't of Educ., January 2013; https://www.stateboard.education.pa.gov/Documents/Regulations%20and%20Statements/State%20Academic%20Standards/PA%20Core%20Math%20Standards.pdf (last visited May 17, 2024; https://www.education.pa.gov/K-12/Assessment%20and%20Accountability/Keystones/Pages/default.aspx (last visited May 17, 2024).

Eligible Content, and Keystone standards[6] for multiple grade levels. *Id.* at 23-25. For example, Summit's biology curriculum did not "include a competency to explain the process of photosynthesis (separate from comparing to respiration), which "is a big section on the Keystone Exam." *Id.* at 25. Similar deficiencies were found in physics and earth sciences in grades 7-12. *Id.* In social studies, Summit's proposed curriculum failed to address how it would comply with state standards in grades 9-12. *Id.* at 10. In world languages, Summit's application listed standards pertaining to recommended progressions for speaking, writing, and understanding the learned language, but did not include evidence pertaining to those standards in the planned instruction for the unit. *Id.* at 27.

According to the District, Summit's application provided no curriculum at all to address state requirements and standards in family and consumer science. District Report at 41. Also, its curriculum in career education was insufficient to meet state standards and requirements, including the Future Ready Index, an assessment conducted by the Pennsylvania Department of Education that measures students' college and career readiness.[7] *Id.* at 41-42. Similarly, Summit's application included programming in personal finance, but failed to state how that programming would integrate and implement state standards in that area.[8] *Id.* at 42-44. Summit's application lacked any mention of how it would integrate and

---

[6] https://www.education.pa.gov/K-12/Assessment%20and%20Accountability/PSSA/Pages/default.aspx (last visited May 17, 2024).

[7] https://www.education.pa.gov/K-12/ESSA/FutureReady/Pages/default.aspx (last visited May 17, 2024.

[8] https://www.education.pa.gov/Teachers%20-%20Administrators/Curriculum/Economic FinancialLiteracy/Pages/default.aspx (last visited May 17, 2024).

implement Pennsylvania's standards in "STEELS" (Science, Technology, Engineering, Environmental Literacy, and Sustainability).[9] *Id*. at 45-46.

The District also concluded that Summit's application, which was prepared by the teachers of the current private school, failed to set forth sufficient planned instruction in various grade levels and subject areas. District Op. at 7 & 12. For example, Summit's social studies curriculum included various links to websites and online resources, such as Google Hangout and Google Classroom Discussion Questions, but failed to tie those websites and resources to actual lesson plans or classroom strategies. District Report at 10-11. Also in social studies, Summit's proposed curriculum included lesson plans for fewer than half of the projected days in planned instructional units in several grade levels. *Id*. at 11.

The curriculum for English contained items that were not "developmentally appropriate" for the designated grade levels and were not evidence-based or research-based. District Report at 12-14. For instance, the application included items for secondary-level students from an online learning source for elementary students; conversely, other items proposed for younger students contained "mature and graphically violent" subject matter more suitable for older students, such as material on international warfare, police brutality, homophobia, and the assassination of Martin Luther King, Jr. *Id*. at 12-13.

In other parts of the proposed curriculum, the same reading materials were assigned for multiple grade levels. District Report at 13. In some subject fields, the application was unclear as to "which [advance placement (AP)] courses will be provided and at which grade levels." *Id*. at 16, 35-37. The District noted that at the high school level, the offerings in literature were limited to a single course

_____

[9] https://www.education.pa.gov/Teachers%20-%20Administrators/Curriculum/Science/Pages/Science-Standards.aspx (last visited May 17, 2024).

at the ninth grade level. *Id*. at 49. Other items and even entire lesson plans were copied from internet sources, such as "Teachers Pay Teachers," an open-source website for teachers to share experiences and insights, that lacked vetting regarding educational viability or the credentials of the people who contributed to the websites.[10] *Id*. at 13-14.

The District also concluded that Summit's planned curriculum for mathematics provided insufficient time in multiple grade levels to cover key concepts within the study fields of algebra, geometry, and trigonometry. District Report at 18. Other math content in the application was copied from uncredentialed online sources, repeated in different grade levels, or developmentally inappropriate as either too sophisticated or too elementary for the assigned grade level. *Id*. at 20-22.

Similarly, in science, Summit's curriculum included developmentally inappropriate or insufficiently vetted sources. District Report at 26-27. In addition to sourcing various science curriculum items from "Teachers Pay Teachers," the application cited Wikipedia, Google documents that were unavailable, and sometimes no source at all. *Id*.

In world languages, the District noted that Summit's application provided a complete curriculum only for Spanish, with the caveat that the application did not appear to include a class for the ninth grade. District Report at 29. The online language-learning company Rosetta Stone was cited as the source for other language offerings. *Id*. In arts education, Summit's application cited YouTube videos as resources and included some curriculum items without any references at all. District Report at 30.

---

[10] https://www.teacherspayteachers.com/About-Us (last visited May 17, 2024).

Aside from the application's failure to provide ELD in accordance with state standards, as discussed above, the District found Summit's application failed to explain which English language learning approach or model it planned to implement or whether instruction would be based on one model or individualized based on student needs. District Report at 56. This part of the application also had generalized technical deficiencies such as unreadable text and references to "folders" that could not be located. *Id*. at 56. Standards, schedules, and proficiency testing dates were missing. *Id*. at 56. The District noted that a significant portion of what Summit did include in its ELD section had been copied from the District's own ELD handbook; however, the application failed to explain how it would be adapting or implementing the District's programming in a practical or innovative manner. *Id*. at 56.

With regard to Summit's application as a whole, the District observed: "An ongoing weakness in this application is the inclusion of educational buzzwords and programs without providing any detail of how the programs would work, be integrated with and complement other educational programming, impact scheduling, impact teacher training needs and professional development, impact student schedules, and impact the budget." District Report at 37. Moreover, the application "includes documents that were copied from other websites and that were not properly reviewed or updated by [Summit] for accuracy. This casts doubt as to whether or not [Summit] is fully aware of and intends to follow the guidelines included in its application." *Id*. at 57.

The District pointed out that while Summit's application relied heavily on content from Summit Learning, a comprehensive educational support platform,[11]

---

[11] https://www.summitlearning.org/join-us/program (last visited May 17, 2024).

the application failed to expressly cite, credit, or reference Summit Learning or explain whether the proposed charter school would be formally adopting the Summit Learning model. District Report at 50. Notably, at the February 2021 hearing, Summit's witness acknowledged the application's extensive use of materials from Summit Learning, which are available online for free, but stated that the proposed charter school would not actually be subscribing to or otherwise using the platform. Reproduced Record (R.R.) at 9276a. The District concluded that the application's extensive and material deficiencies in key areas such as the curriculum raised serious concerns as to Summit's ability to function effectively as a charter school, particularly as the founding leadership had little or no charter school experience and the current private school had an enrollment of fewer than 60 students. District Report at 96.

The District determined that Summit's application failed to differentiate within its proposed curriculum for students of varying ability levels. The application failed to establish benchmark proficiency criteria and goals based on the federal Every Student Succeeds Act (20 U.S.C. §§ 6301-7981).[12] District Report at 47. There was not a clear plan for standards or even scheduling of student assessments in order to chart and evaluate student achievement and growth. *Id*. at 47. The application provided insufficient information on grading practices and criteria. *Id*. at 48. The application did not indicate any "inten[t] to offer students National Honor Society opportunities that promote scholarship, service, leadership and character." *Id*. at 48. The application also lacked any information concerning participation in the federally funded Targeted Assistance programs for "educationally deprived children" who may be eligible for help to meet academic

---

[12] https://www.ed.gov/essa?src=rn (last visited May 17, 2024).

9

standards and benefit from improved educational opportunities.[13] *Id*. at 55. The application stated that students who might be eligible for special education services for the disabled would be referred to the Philadelphia Hebrew Public Charter School (PHPCS) for further evaluation. *Id*. at 57. However, the application failed to explain the nature of its relationship with PHPCS or the practicalities of sending students to a school at least two hours' distance from Summit for the evaluations. *Id*. at 57. The District added that Summit's projected budget for special education students as comprising 16% of its enrollment failed to reflect the actual demographic needs of the District, which has a special education enrollment of 23% of total students, or to account for how Summit would serve students whose needs exceeded the "basic education funding threshold." *Id*. at 59.

The District concluded that Summit's application did not provide a sufficient plan for credit recovery and remediation for students who fall behind in academic credits or enroll in the school with insufficient academic credits for their grade level. District Report at 49. Having programs or curriculum items for this purpose gives such students the ability to graduate with their classes. *Id*. at 49.

The District found deficiencies in Summit's application concerning its employee health insurance and retirement plans, which by law must be equivalent to those provided by local district schools. District Report at 71. The application included no details at all regarding employee health benefits, which made it impossible for the District to evaluate Summit on that issue. *Id*.; District Op. at 33-34. As to employee retirement plans, the application lacked information on

---

[13] https://www.education.pa.gov/Teachers%20-%20Administrators/Federal%20Programs/TitleI/Pages/default.aspx (last visited May 17, 2024).

contribution percentages or dollar amounts, a vesting schedule, or when the plan would be presented to authorities for approval. *Id*.; District Op. at 32-33.[14]

At the December 2020 and February 2021 public hearings held by the District, Summit's witnesses addressed the school's proposed financial support and governance as well as its engagement with a model called MicroSociety, which would supplement core curriculum study areas by having students engage in building their own society with weekly student meetings, businesses, and a government. R.R. at 9178a-79a, 9193a-9203a, 9213a-18a, 9299a.

With regard to the school's academic curriculum, the school's principal stated that Summit was still looking into AP classes at the high school level, but was unsure which classes would be offered; that would depend on student choice and teacher availability once the school began operations. R.R. at 9203a-07a. The school planned to use Measures of Academic Process (MAP) assessment tools from the Northwest Evaluation Association (NWEA) and students would take various PSSA and Keystone examinations as required for their grade levels. *Id*. at 9205a. Summit's principal acknowledged that she had no experience in setting assessment goals and reporting results to the District, but stated she planned to learn. *Id*. at 9300a-03a.

With regard to non-academic issues raised by the District, the school's principal confirmed that Summit's teachers would not be permitted to participate in the state's Public School Employees' Retirement System (PSERS) due to its

---

[14] The District also found that Summit's application improperly expressed admission preferences for the grandchildren of Summit's founders and board members. District Report at 91; District Op. at 26. Summit asserts that this aspect of its admissions policy has been dropped from its previous applications, but through an oversight, the language was not deleted from the third application. Summit's Br. at 40. However, an assertion in a brief is not evidence and is not part of the record before us on appeal. *Jones v. Workers' Comp. Appeal Bd. (City of Chester)*, 961 A.2d 904, 907 n.7 (Pa. Cmwlth. 2008).

11

"prohibitive cost." R.R. at 9313a. Summit intended to establish a retirement plan for its teachers, but a board member stated that Summit needed to receive its charter before it could sign a formal agreement on a retirement plan. *Id*. at 9313a-16a.

The District's June 2022 opinion incorporated the foregoing findings from the District Report. The opinion also provided an analysis of Summit's application in accordance with Section 1717-A(e)(2) of the Charter School Law (CSL),[15] 24 P.S. § 17-1717-A(e)(2). That section requires that a charter school application shall be evaluated by the local school board based on several criteria, including but not limited to community support (this element is not at issue here), the capability of the charter to provide "comprehensive learning experiences" to its students, the extent to which the charter's application provides sufficient information required in Section 1719-A of the CSL, 24 P.S. § 17-1719-A, and the extent to which the charter school may serve as a model for other public schools.

The District concluded that given the extensive deficiencies of Summit's application as set forth in the District Report, Summit failed to meet the requirements. The application did not show Summit's capability to provide comprehensive learning experiences to students because the proposed curriculum failed to show how it would meet Pennsylvania's educational standards, lacked key portions of a fully developed and comprehensive curriculum, and did not sufficiently address how the varying needs of students would be met. District Op. at 39-42. The District also expressed concerns about the lack of public education experience among Summit's academic leadership and board, potential ethics issues regarding the academic and business interests of Summit's board members, and deficiencies

_____

[15] The Charter School Law (CSL) is part of the School Code, added by the Act of June 19, 1997, P.L. 225, which may be found at 24 P.S. §§ 17-1701-A – 17-1751-A.

12

in the proposed budget; all of these contributed to the questionable ability of Summit to provide comprehensive learning experiences. *Id*. at 42, 44-48.

The District next concluded that Summit's application failed to show sufficient consideration of Section 1719-A of the CSL, 24 P.S. § 17-1719-A, which corresponds to subsection (iii) of Section 1717-A(e)(2) and sets forth 17 elements required in a charter application. District Op. at 49-52. The potential issues arose with Summit's governance structure, curriculum and assessment methods, admissions policy and criteria, financial plans, ownership and lease arrangements for the physical facilities, professional faculty development, and appropriate insurance coverage. *Id*.

Lastly, the District found that based on its overall review of Summit's application and the multiple deficiencies therein, Summit would not serve as a model for other public schools pursuant to subsection (iv) of Section 1717-A(e)(2). District Op. at 52.

Summit timely appealed to the Board, which accepted briefs and heard argument from the parties in January 2023. Board Op. at 3. At argument, Summit's counsel characterized the District's issues with Summit's application as "minor shortcomings" that should not sway the Board against Summit's unique mission and the availability of school choice for parents. R.R. at 9670a. Counsel stated that Summit had successfully provided comprehensive learning experiences to its students over its six years as a private school and had a viable track record. *Id*. at 9670a-71a. Additionally, Summit's application included a sufficient description and roadmap for alignment with state academic standards and the District's critiques "far exceeded" what the CSL requires. *Id*. at 9671a. Counsel challenged the District's conclusions on some specific areas of study, averring, for example, that the ELD

13

teacher who would be in place during the first year would be able to adequately address compliance with English learning standards and any other issues in that regard. *Id.* at 9673a-74a. Counsel averred that the argument format's time constraints did not allow a fully detailed response to the District's critiques, but stated that the application, which was 3,000 pages long, met all of the necessary requirements; it just did so "in a different way than [sic] the District is used to." *Id.* at 9688a.

Counsel for the District replied that the requirements for a charter school are concrete and specific, and that Summit's application had failed to meet those requirements. R.R. at 9678a. Counsel noted that Summit had received specific commentary on its first two applications and had rectified some of the shortcomings in its third application, but material deficiencies remained that were more than "minor shortcomings." *Id.* at 9679a. Summit's application failed to align with state academic standards and statutory requirements across multiple core areas of study and still had multiple other issues, some of which Counsel listed from the District's report. *Id.* at 9680a-85a. Counsel noted that Summit planned to offer high school grades in its first year of operation and stated that compliance with requirements at that level is a serious matter because students approaching graduation should be at a level of proficiency that cannot be made up after they leave the school system. *Id.* at 9681a.

The Board unanimously voted to affirm the District's determination and dismiss Summit's appeal on February 21, 2023, and issued its written opinion and order on April 22, 2023. Board Op. at 1 & 22. The Board's opinion largely adopted the District's findings of fact and conclusions. *Id.* at 1-7 & 12-21. The Board stated that Summit's presentation on appeal failed to rebut the District's

14

findings and conclusions and relied instead on generalized contentions in support of its application and attacks against the District. *Id*. at 13. The Board noted that the multiple deficiencies in Summit's application were particularly faulty in light of the District having pointed out issues "during multiple phases of the application process." *Id*. Summit's timely appeal to this Court followed.

## II. Issues Presented

Summit presents three main issues in this appeal. First, Summit asserts that the Board erred in concluding that Summit's application did not demonstrate the capability to provide comprehensive learning experiences to its students. Petition for Review at 3-4. Second, Summit avers that the Board erred in concluding that Summit's application failed to comply with Section 1719-A of the CSL and failed to conform with the legislative intent of the CSL. *Id*. Third, Summit avers that the Board erred in concluding that Summit could not serve as a model for other public schools. *Id*.

## III. Discussion

In reviewing a local school board's determination on a charter school application, the Board is statutorily authorized to conduct an independent *de novo* review. *Carbondale Area Sch. Dist. v. Fell Charter Sch.*, 829 A.2d 400, 403-04 (Pa. Cmwlth. 2003) (citing Subsection 1717–A(i)(6) of the CSL, 24 P.S. § 17–1717–A(i)(6)). The Board's written opinion must be specific enough to give an applicant enough information to revise its presentation should it subsequently wish to reapply for a charter. *Comm. Serv. Leadership Dev. Charter Sch. v. Pittsburgh Sch. Dist.*, 34 A.3d 919, 925 (Pa. Cmwlth. 2012). This Court's subsequent scope of review of

15

the Board's determination "is limited to whether constitutional rights were violated, errors of law were committed, or the decision is not supported by substantial evidence." *Carbondale Area Sch. Dist.*, 829 A.2d at 403 n.1.

Summit's appeal concerns Section 1717-A(e)(2) of the CSL, 24 P.S. § 17-1717-A(e)(2), which mandates that a charter school application shall be evaluated by the local board of school directors based on several criteria, including but not limited to:

> (i) The demonstrated, sustainable support for the charter school plan by teachers, parents, other community members and students, including comments received at the public hearing held under subsection (d).
>
> (ii) The capability of the charter school applicant, in terms of support and planning, to provide comprehensive learning experiences to students pursuant to the adopted charter.
>
> (iii) The extent to which the application considers the information requested in section 1719-A and conforms to the legislative intent outlined in section 1702-A.
>
> (iv) The extent to which the charter school may serve as a model for other public schools.

24 P.S. § 17-1717-A(e)(2). As noted above, subsection (i) is not at issue here. The other three subsections will be addressed in turn.

### A. Comprehensive Learning Experiences

Subsection (ii) of Section 1717-A(e)(2) requires that charter school applicants show capability "to provide comprehensive learning experiences to students pursuant to the adopted charter." 24 P.S. § 17-1717-A(e)(2)(ii). The term "comprehensive learning experiences" is not defined in the CSL, but as applied, it

broadly pertains to a charter school's curriculum, instruction strategies, financial plan, and educational administration. *See*, *e.g.*, *McKeesport Area Sch. Dist. v. Propel Charter Sch. McKeesport*, 888 A.2d 912, 917-19 (Pa. Cmwlth. 2005) (addressing adequacy of student progress assessment program, special education program, discipline policy, and core curriculum areas). However, within this category, the Board has consistently maintained that the quality of the charter school's proposed curriculum is primary and can even be dispositive:

> The curriculum of a school, any school, is one of the most significant building blocks of the educational program at that institution. To not have the curriculum completed and fully aligned shows a lack of adequate planning. As we have previously observed, *a charter school's failure to provide a sufficient curricular plan is a basis for denial of an application*, and that plan must be fully developed at the time the application is filed, rather than being a goal or guideline that an appropriate curriculum will be developed later.

*In Re: Thomas Paine Charter School*, CAB Docket No. 2009-04 (Feb. 17, 2010), at 9 (italics added) (holding that "significant omissions" in charter applicant's proposed curriculum meant that applicant could not provide comprehensive learning experiences to students); *see also Joan Myers Brown Acad. v. Sch. Dist. of Phila.*, CAB Docket No. 2022-02 (June 16, 2023), at 25; (concluding that "[t]he proposed curriculum for the Charter School is not adequate to offer comprehensive learning experiences to its students as required by the CSL. The Board concludes that this deficiency on its own is sufficient ground to deny the charter application."); *In Re: Appeal of Env't Charter Sch. at Frick Park*, CAB Docket No. 2007-05 (Mar. 28, 2017), at 7 (stating that applicant's failure to provide a sufficiently detailed curriculum at time of application "is sufficient grounds for denial of the charter").

17

Within this category, Summit appeals three of the District's curriculum-oriented findings and conclusions that were upheld by the Board.

### 1. Alignment of Summit's Curriculum with State Standards

The Pennsylvania Department of Education's regulations concerning public schools, including charter schools, state that curricula "be designed by school entities to achieve the academic standards under § 4.12 (relating to academic standards) and any additional academic standards as determined by the school entity." 22 Pa. Code § 4.4(a).[16] Schools must provide proof of planned instruction designed to enable students to meet academic standards, including objectives, materials, activities, estimated instructional time, the relationship between the planned instruction and the standards, and procedures for measurement of the objectives. 22 Pa. Code § 4.11(h); *see also* 22 Pa. Code § 4.12(d) (requiring that "a school entity's curriculum shall be designed to provide students with planned instruction needed to attain these academic standards"). In *Vision Academy Charter School of Excellence v. Southeast Delco School District* (Pa. Cmwlth., No. 46 C.D.

---

[16] As noted above, Section 4.12 of the regulations enumerates standards for multiple core areas of study. For example, in mathematics, schools must ensure

> the understanding of fundamental ideas and the development of proficient mathematical skills in numbers, computation, measurement, statistics and data analysis, probability and predictions, algebra and functions, geometry, trigonometry and concepts of calculus. Using this content, students will learn to think, reason and communicate mathematically. Students will learn to model real-world situations by creating appropriate representations of numerical quantities and plan and implement problem-solving strategies to answer the question in the context of the situation.

22 Pa. Code § 4.12(a)(9).

2022, filed March 30, 2023), slip op. at 18, 2023 WL 2702373, at *10 (unreported), this Court reversed a Board determination that the applicant failed to establish alignment with state standards; we concluded that in light of the applicant's inclusion of an appendix to its application that specifically "detailed curriculum frameworks aligned to" various academic standards, it had satisfied this aspect of the criteria.

The District's Opinion, drawing on its Report, concluded that multiple areas in Summit's application failed to comport with state academic standards. District's Op. at 43. In upholding the District's determinations in this regard, the Board stated that on appeal, Summit failed to rebut the District's conclusions beyond generalized contentions that it submitted a large volume of curricular materials that demonstrated compliance with state standards. Board Op. at 13.

Summit maintains that its curriculum is sufficiently aligned with state standards. Summit's Br. at 25-27. Summit avers that the Board disregarded substantial evidence in the record and failed to specify the areas where Summit's application was deficient. *Id.* Summit states that in multiple parts of its application, there are "documents that contain prominent introductory text in large font stating, for example, 'This document includes PA Core Mathematics standards maps'" for Summit's K-8 grades. *Id.* at 26 (citing R.R. at 6114a). Summit cites this Court's *Vision Academy* opinion and provides a list of 23 additional pages in the Reproduced Record that it asserts showed compliance with standards. *Id.* at 25. The District responds that the Board did not err in relying upon the District's Report and Opinion, both of which provided extensive and detailed aspects of Summit's failure to properly align its proposed curriculum with academic standards. District's Br. at 22-24.

The Board did not err in this regard. The 23 record pages cited by Summit in support of its argument actually reveal many of the defects in its application. Narrative overviews of the proposed English Language Arts and science curricula do not mention state standards. R.R. at 5699a & 6368a. Other pages cited by Summit state that the school's "career readiness" and physical education programs will comply with state standards, but Summit's list does not cite pages giving similar assurances for core academic subject areas. *Id*. at 5688a & 7144a. Other cited pages include "maps" for mathematics, science, history, social studies, arts, music, and Spanish that list study areas and standards for those topics but lack any discussion or reference to discussion of how Summit will apply or implement these "maps." *Id*. at 6114a, 6371a, 6765a, 7282a, 7585a, 7808a. One cited page provides a list of science "learning targets" that describes state standards for a course of instruction on organisms and ecosystems without any discussion or reference to discussion of how Summit will apply or implement these "learning targets." *Id*. at 6497a. Another cited page provides a list of high school credit requirements for graduating from Summit without any reference to how the list comports with state requirements. *Id*. at 7944a.

Of the 23 record citations Summit lists in its brief to support its assertion that its curriculum complies with state academic standards, only 4 references point to documents that set forth specific plans to align coursework with state academic standards in science.[17] *See* R.R. at 6528a-29a, 6849a, & 6607a. By contrast, the District's Report, which was incorporated into the District's Opinion, which in turn was upheld by the Board, enumerated extensive instances in which Summit's application failed to establish the requisite alignment with standards

_____

[17] The portion of Summit's Reproduced Record that includes its entire application is comprised of roughly 3,600 pages in 7 volumes.

across multiple areas of study and grade levels. For example, Summit's plan to mix students of different ages in grade levels did not explain how standardized testing required in grades 3-8 would be accomplished; the application provided insufficient ELD instruction in specific core academic fields; in math, science, technology, environmental studies, English, world languages, and social studies, the application failed to address or even mention certain specific standards; and the application failed to account for required standards for civics assessments, family and consumer science, career education, and personal finance. District's Report at 6-7, 9-12, 15, 18-25, 27, 41-46.

Summit bears the burden of demonstrating that the Board's determination was not supported by substantial evidence. See *Carbondale Area Sch. Dist.*, 829 A.2d at 403 n.1. Given the above consideration of the record and, in particular, the Board's incorporation by reference of the District's critiques of multiple areas where the application falls short, Summit has failed to do so. Moreover, this case differs from *Vision Academy*, where the charter school was able to point to concrete documentation of how its proposed curriculum aligned with standards. In that case, "the [charter school] included Appendix B – Aligned Curriculum, which detailed curriculum frameworks aligned to PA Core Standards and Pacing Plans, PA [English Language Learners] Standards, and PA academic standards." *Vision Acad. Charter Sch.*, slip op. at 18, 2023 WL 2702373, at *10.

Moreover, although the Board's opinion does not provide as much detail as the District's report and opinion, the Board endorsed the numerous critiques of Summit's application that had been previously provided by the District. Board Opinion at 13 (explaining that "[d]espite bearing the burden of proof and having these deficiencies pointed out by the District during multiple phases of the

21

application process, Summit has declined to present any specific rebuttal, relying instead on generalities"). As such, the Board's opinion does not leave Summit without guidance should it decide to apply for a charter again in the future. *See Comm. Serv. Leadership Dev. Charter Sch.*, 34 A.3d at 925. Given the foregoing, Summit has not established that the Board erred or disregarded substantial record evidence in affirming the District's determination concerning academic standards.

## 2. Failure to Demonstrate Planned Instruction for Various Grade Levels and Subject Areas

Section 4.11 of the applicable regulations states that public schools, including charter schools, must provide "planned instruction to enable students to attain academic standards under § 4.12." 22 Pa. Code § 4.11 (setting forth proficiency standards in various areas of study). Planned instruction entails the following elements:

(1) Objectives of a planned course, instructional unit or interdisciplinary studies to be achieved by all students.

(2) Content, including materials and activities, and estimated instructional time to be devoted to achieving the academic standards. Courses, instructional units or interdisciplinary studies of varying lengths of time may be taught.

(3) The relationship between the objectives of a planned course, instructional unit or interdisciplinary studies and academic standards specified under § 4.12 and any additional academic standards as determined by the school entity.

(4) Procedures for measurement of the objectives of a planned course, instructional unit or interdisciplinary studies.

22 Pa. Code § 4.11. "Curriculum" is defined as "[a] series of planned instruction aligned with the academic standards in each subject that is coordinated and articulated and implemented in a manner designed to result in the achievement at the proficient level by all students." 22 Pa. Code. § 4.3. Thus, for all of the grade levels Summit plans to offer (K-12), it must establish sufficient planned instruction for all of the subject areas of study it plans to offer.

The District's Opinion, drawing on its Report, concluded that Summit's application lacked sufficient planned instruction in multiple grade levels and areas of study. District's Op. at 41-42. In upholding the District's determinations in this regard, the Board stated that on appeal, Summit failed to rebut the District's conclusions beyond generalized contentions that it submitted a large volume of curricular materials that demonstrated compliance with state standards. Board Op. at 13.

Summit asserts that the Board disregarded substantial record evidence in upholding the District's determination in this regard. Summit's Br. at 27-29. Summit maintains that its application contained satisfactory planned instruction for the grade levels and subject matters it plans to offer and presented extensive and specific plans for implementation, including reading the children's novel "The Lemonade War" in third grade English, creating a Spanish-language school schedule in eighth grade Spanish, and writing a United Nations resolution in tenth grade social studies. *Id*. at 28 (citing R.R. at 5858a-61a, 7426a-27a & 7075a-78a). Summit avers that its application was voluminous and covered all areas at issue and that as a practical matter, it can only point to these examples in its brief. *Id*. The District, supported by the Board's determination, argues that Summit's application is missing

evidence of sufficient planned instruction for various grade levels and subject areas. District's Br. at 21.

Notwithstanding the three examples provided by Summit, the record supports the Board's affirmance of the District's determination in this regard. Summit has not refuted the many instances in the District's Report where aspects of planned instruction in core academic areas are insufficient, missing, or contain problematic content. These include Summit's reliance on unvetted or unavailable resources for materials to be used in primary areas of instruction, reference to materials that are inappropriate for the assigned grade levels, the lack of high school-level literature and sufficiently detailed or comprehensive ELD and AP offerings, and any language offerings other than Spanish. District Report at 10-14, 20-22, 26-27, 29 & 56.

Summit bears the burden of demonstrating that the Board's determination was not supported by substantial evidence. See *Carbondale Area Sch. Dist.*, 829 A.2d at 403 n.1. Given the above consideration of the record and, in particular, the Board's incorporation by reference of the District's critiques of multiple areas where the application falls short, Summit has failed to do so. As in the above discussion, this case can be distinguished from *Vision Academy*. There, the charter school responded to the district's concerns by referencing a specific part of its application that sufficiently refuted the bulk or entirety of those concerns. *Vision Acad. Charter Sch.*, slip op. at 18, 2023 WL 2702373, at *10. In this case, Summit failed to convince the Board that the District erred in concluding that the proposed curriculum lacked satisfactory planned instruction for the various grade levels and subject areas Summit proposed to offer. Board Op. at 12-13. Similarly, in its brief to this Court, other than the three relatively minor examples described

24

above, Summit presents no basis in the record for this Court to conclude that either the District or Board erred or ignored substantial evidence to the contrary.

Moreover, although the Board's opinion does not provide as much detail as the District's report and opinion, the Board endorsed the numerous critiques of Summit's application that had been previously provided by the District. Board Op. at 13 ("Despite bearing the burden of proof and having these deficiencies pointed out by the District during multiple phases of the application process, Summit has declined to present any specific rebuttal, relying instead on generalities."). As such, the Board's opinion does not leave Summit without guidance should it decide to apply for a charter again in the future. *See Comm. Serv. Leadership Dev. Charter Sch.*, 34 A.3d at 925. Given the foregoing, Summit has not established that the Board erred or disregarded substantial record evidence in affirming the District's determination concerning the application's failure to demonstrate planned instruction for various grade levels and subject areas.

### 3. Failure to Differentiate Within Proposed Curriculum for Students of Varying Ability Levels

Section 4.28 of the applicable regulations requires that students eligible for special education or gifted learning be provided with the necessary instruction:

> (a) Under the Individuals with Disabilities Education Act [20 U.S.C. §§ 1400-1482] and this part, children with disabilities shall be provided an education which enables them to be involved in and progress in the general curriculum under this chapter.
>
> (b) Students who are gifted as defined in this part shall be provided an education that enables them to participate in acceleration or enrichment, or both, as appropriate.

25

(c) The educational program provided to children with disabilities shall be in accordance with their Individualized Education Programs under the Individuals with Disabilities Education Act and this part, even if the Individualized Education Program does not otherwise meet all requirements of this chapter.

(d) Planned instruction for children with disabilities shall conform to the requirements established for planned courses in § 4.3 (relating to definitions) as it relates to planned instruction.

22 Pa. Code § 4.28. These requirements extend to charter schools to the extent that children with special needs are enrolled in such schools. *See Richard Allen Preparatory Charter Sch. v. Sch. Dist. of Phila.*, 123 A.3d 1101, 1122 (Pa. Cmwlth. 2015).

The District's Opinion, drawing on its Report, highlighted the lack of AP courses in Summit's curriculum, as well as concerns with Summit's plans to address the needs of students who require special education. District Op. at 13 & 23-24. The District also expressed concern with Summit's plan for students who fall behind in academic credits or enter the school with fewer credits than necessary for their grade level, particularly at the high school level where timely graduation is a high priority. District Opinion at 42-43; District Report at 49. The Board upheld the District's findings and conclusions, noting that on appeal, Summit had failed to specifically rebut the District's findings, relying instead on generalized contentions in support of its application. Board Op. at 13-14.

Summit points to a "differentiation document" in its application that addresses this issue, as well as to aspects of its teacher handbook that would require teachers to prioritize personalized instruction and appropriately differentiate the curriculum for students at all levels. Summit's Br. at 29-30. In response, the District points as support to the Board's determination in this regard. District's Br. at 12-13.

26

The District adds that the issue is not whether students should receive personalized teaching geared to their abilities, but the concrete matter of course offerings in special education for learning disabled students and AP offerings for students at higher academic levels; the District refers to the already-addressed deficiencies in Summit's offerings in these regards. *Id*. at 21 n.4.

In the record, the "differentiation document" cited by Summit states that a team approach to instruction will be in place and that classroom teachers will work with special education and English language instructors to ensure that all students are properly assessed and supported. R.R. at 8821a-22a. Fifteen bullet-pointed methods for achieving that end are listed, including use of assistive technology, extended timelines, one-to-one instruction, and supplemental materials. *Id*. These proposed solutions are generalized and fail to address the material issues identified by the District, including the lack of clear plans for individualized assessments, AP offerings, and special education. District Report at 16, 35-37, 47-48, 55-59. In particular, the District expressed valid concerns about Summit's plan to refer potential special education students to the PHPCS for evaluation, its special education budget allocation based on a special education population of 16% (whereas the District's special education population is 23%), and its lack of plans and budgeting for students whose special education needs exceed the "basic education funding threshold." *Id*. at 57-59.

Summit bears the burden of demonstrating that the Board's determination was not supported by substantial evidence. See *Carbondale Area Sch. Dist.*, 829 A.2d at 403 n.1. Given the above consideration of the record and, in particular, the Board's incorporation by reference of the District's critiques of multiple areas where the application falls short, Summit has failed to do so. As

27

discussed above, this aspect of this case can be distinguished from *Vision Academy*. There, the charter school responded to the district's concerns by referencing a specific part of its application that sufficiently refuted the bulk or entirety of those concerns. *Vision Acad. Charter Sch.*, slip op. at 18, 2023 WL 2702373, at *10. In this case, Summit failed to convince the Board that the District erred in concluding that the proposed curriculum failed to provide sufficient planning for variations in student ability levels ranging from special education for the learning disabled to AP coursework for advanced students. Board Op. at 13. Similarly, in its brief to this Court, other than pointing to the generalized "differentiation document" and asserting that individualized education would be prioritized, Summit presents no basis in the record for this Court to conclude that either the District or Board erred or ignored substantial evidence.

Moreover, although the Board's opinion does not provide as much detail as the District's report and opinion, the Board endorsed the numerous critiques of Summit's application that had been previously provided by the District. Board Op. at 13 ("Despite bearing the burden of proof and having these deficiencies pointed out by the District during multiple phases of the application process, Summit has declined to present any specific rebuttal, relying instead on generalities."). As such, the Board's opinion does not leave Summit without guidance should it decide to apply for a charter again in the future. *See Comm. Serv. Leadership Dev. Charter Sch.*, 34 A.3d at 925. Given the foregoing, Summit has not established that the Board erred or disregarded substantial record evidence in affirming the District's determination concerning the application's failure to show appropriate differentiation within its curriculum for students' varying ability levels.

## B. Information Requested in Section 1719-A of the CSL and Conformity with Legislative Intent

Summit next argues that its application complies with Section 1717-A(e)(2)(iii), in that it sufficiently "considers the information requested in section 1719-A and conforms to the legislative intent outlined in section 1702-A." 24 P.S. § 17-1717-A(e)(2)(iii). Like the Board, we reject this argument.[18]

### 1. Section 1719-A Requirements

Section 1719-A of the CSL states that

[a]n application to establish a charter school shall include all of the following information:

(1) The identification of the charter applicant.

(2) The name of the proposed charter school.

(3) The grade or age levels served by the school.

(4) The proposed governance structure of the charter school, including a description and method for the appointment or election of members of the board of trustees.

(5) The mission and education goals of the charter school, the curriculum to be offered and the methods of assessing whether students are meeting educational goals.

---

[18] Summit's failure to present a curriculum that satisfies the "comprehensive learning experiences" category is dispositive in this matter. *Thomas Paine Charter Sch.*, slip op. at 9 (stating that "a charter school's failure to provide a sufficient curricular plan is a basis for denial of an application"); *see also Joan Myers Brown Acad.*, slip op. at 25; (same); *Appeal of Env't Charter Sch. at Frick Park*, slip op. at 7 (same). However, we address the additional relevant factors in Section 1717-A(e)(2) in the interest of completeness.

(6) The admission policy and criteria for evaluating the admission of students which shall comply with the requirements of section 1723-A.

(7) Procedures which will be used regarding the suspension or expulsion of pupils. Said procedures shall comply with section 1318.

(8) Information on the manner in which community groups will be involved in the charter school planning process.

(9) The financial plan for the charter school and the provisions which will be made for auditing the school under section 437.

(10) Procedures which shall be established to review complaints of parents regarding the operation of the charter school.

(11) A description of and address of the physical facility in which the charter school will be located and the ownership thereof and any lease arrangements.

(12) Information on the proposed school calendar for the charter school, including the length of the school day and school year consistent with the provisions of section 1502.

(13) The proposed faculty and a professional development plan for the faculty of a charter school.

(14) Whether any agreements have been entered into or plans developed with the local school district regarding participation of the charter school students in extracurricular activities within the school district. Notwithstanding any provision to the contrary, no school district of residence shall prohibit a student of a charter school from participating in any extracurricular activity of that school district of residence: Provided, That the student is able to fulfill all of the requirements of participation in such activity and the charter school does not provide the same extracurricular activity.

(15) A report of criminal history record, pursuant to section 111, for all individuals who shall have direct contact with students.

(16) An official clearance statement regarding child injury or abuse from the Department of Public Welfare as required by 23 Pa.C.S. Ch. 63 Subch. C.2 (relating to background checks for employment in schools) for all individuals who shall have direct contact with students.

(17) How the charter school will provide adequate liability and other appropriate insurance for the charter school, its employes and the board of trustees of the charter school.

24 P.S. § 17-1719-A. Relevant to this appeal, with regard to subsections 9 (budget) and 17 (insurance), Section 1724-A(d) of the CSL states that charter school employees "shall be provided the same health care benefits as the employe would be provided if he or she were an employe of the local district." 24 P.S. § 17-1724-A(d). Similarly, pursuant to Section 1724-A(c) of the CSL, charter employees "shall be enrolled" in PSERS or a similar alternative retirement plan. 24 P.S. § 17-1724-A(c).

Here, the District found multiple areas where Summit's application failed to comply with Section 1719-A, including Summit's proposed governance structure (subsection 4), enrollment policies (subsection 6), and financial plans and liability insurance (subsections 9 and 17). *See* Board Op. at 15-19 (describing the District's findings). The Board overruled the District on most of these issues. *Id.* However, the Board upheld the District's concerns about Summit's plans for its employees' health insurance and retirement benefits, which fall within subsections 9 and 17. *Id.* at 19-20. The District stated that because Summit had not yet identified any specific health or retirement plans for employees, its compliance with subsections 9 and 17 could not be properly evaluated. District Op. at 47-48. The

31

Board agreed, finding Summit's "pledge" to provide appropriate benefits once it received its charter insufficient given the CSL's statutory mandate requiring equivalent coverage. Board Op. at 19-20.

Summit maintains that it would be impossible to require a charter to have such plans in place at the time of application and that in the instance of health insurance, its pledge "to provide such benefits insofar as the constraints of the health insurance marketplace allow" should be sufficient. Summit's Br. at 36. Similarly, Summit avers that its pledge to provide a retirement plan adequate to replace PSERS, which it refuses to join, should be sufficient. *Id*. at 37. Summit adds that this Court should not read the CSL to require charter schools to have fully developed health and retirement benefits at the time of application, nor should we conclude that failure to do so is fatal to an application. *Id*. at 37. The District replies that while fully actualized benefit plans may not be viable at the application stage, an applicant should have some description and provision for its plans, including at the least a proposed budgetary allocation for them. District's Br. at 34-36. The District adds that the conditional nature of Summit's pledge, specifically that it will provide these plans to the best of its ability depending the vagaries of the marketplace, is plainly insufficient given Section 1724-A's mandate that these benefits "shall" be provided to charter employees in an equivalent manner with the local district's health insurance and PSERS. *Id*. at 35-36.

In the record, Summit's third application from November 2020 includes its pledge to provide appropriate health and retirement benefits for its employees, including an alternative to PSERS. R.R. at 5644a. The application maintains that Summit can do no more in this regard until it secures its charter, but that Summit has put items in its budget for these benefits and has been in discussions with a charter

32

school vendor to provide its retirement plan. *Id*. At the February 2021 hearing, Summit's witnesses confirmed that no further progress had been made on securing health and retirement plans and maintained that the CSL did not require it to do so at the application stage. R.R. at 9313a-16a.

Neither party has provided authority for its position, and the sufficiency of a charter applicant's pledge to provide health and retirement employee benefits, particularly if that pledge is contingent upon external conditions such as the health insurance marketplace, appears to be one of first impression. We agree with Summit that it may not be feasible to require a charter applicant to have fully developed plans in place at the time of application.

However, Section 1724-A sets forth a mandatory requirement that charter schools offer employee plans equivalent to those offered by the local school district or PSERS. See 24 P.S. § 17-1724-A(c), (d). Moreover, in *Souderton Charter School Collaborative v. Souderton Area School District*, 291 A.3d 447 (Pa. Cmwlth. 2023), which held that a district did not have the authority to amend an extant charter in this regard, this Court held that health insurance benefits are, at the least, "material" in operating a school because they are "an important aspect of compensation, and it is not uncommon for employers to use health insurance benefits as inducements to obtain or retain talented employees." *Id*. at 454. Logically, retirement benefits are similarly material in terms of school staffing concerns.

Given the mandatory and material nature of health and retirement benefits, which contribute to a school's ability to hire and keep teachers and administrators who support the school's mission and enable it to provide the requisite comprehensive learning experiences required in Section 1717-A(e)(2)(ii) of the CSL, we conclude that a charter applicant must provide more than a bare,

33

nonspecific pledge to provide these benefits. Certainly, a charter applicant may not evade its responsibility by conditioning provision of these benefits on marketplace vagaries. The lack of any relevant record evidence in this case other than Summit's pledge eliminates any necessity of expanding on precisely what an applicant must provide in order to show that the budgetary and insurance aspects of its application comply with Section 1719-A's requirements. However, for purposes of this inquiry, we conclude that Summit's pledge alone, particularly with its conditions depending on the marketplace for health insurance, does not comply with Section 1719-A, and the Board did not err in upholding the District's findings and conclusions in this regard.

## 2. Compliance with Legislative Intent

Section 1717-A(e)(2)(iii) also requires a charter application to conform with the CSL's legislative intent:

> It is the intent of the General Assembly, in enacting this article, to provide opportunities for teachers, parents, pupils and community members to establish and maintain schools that operate independently from the existing school district structure as a method to accomplish all of the following:
>
> (1) Improve pupil learning.
>
> (2) Increase learning opportunities for all pupils.
>
> (3) Encourage the use of different and innovative teaching methods.
>
> (4) Create new professional opportunities for teachers, including the opportunity to be responsible for the learning program at the school site.

34

(5) Provide parents and pupils with expanded choices in the types of educational opportunities that are available within the public school system.

(6) Hold the schools established under this act accountable for meeting measurable academic standards and provide the school with a method to establish accountability systems.

24 P.S. § 17-1702-A. This Court has accepted a Board description of this provision as requiring charter schools to "increase learning opportunities for all pupils, encourage the use of different and innovative teaching methods, and to provide parents and students with expanded choices in the types of educational opportunities that are available within the public school system[.]" *Central Dauphin Sch. Dist. v. Founding Coalition, Infinity Charter Sch.*, 847 A.2d 195, 199 (Pa. Cmwlth. 2004) (quoting from Board decision).

The District did not expressly address this requirement of Section 1717-A(e)(2)(iii), and the Board did not address it in depth. Nevertheless, the Board concluded that "[b]ased on the deficiencies outlined above, Summit falls short of achieving the legislative intent of the CSL." Board Op. at 20.

Summit's argument in this regard treats Section 1717-A(e)(2)(iii) as a composite of the Section 1719-A requirements and the Section 1702-A legislative intent. Summit's Br. at 35-37. Thus, Summit avers that even if its pledges to provide the requisite benefits fail to satisfy the requirements of Section 1719-A, that should not be the basis for rejection of its application because employee benefit plans have no bearing on "pupil learning or the nature and quantity of the learning opportunities on offer at Summit." *Id*. at 35. The District replies that in Section 1717-A(e)(2)(iii), the Section 1719-A and legislative intent requirements are distinct from each other

and each must be met independently; the District otherwise supports the Board's determination. District's Br. at 30 n.8.

As described above, the employee benefit plans a charter school provides are material to its ability to attract and maintain teachers and employees to fulfill the school's overall goals and mission. As such, there is at least an indirect connection between the budget and insurance requirements of Section 1719-A and the legislative intent requirement of Section 1702. However, we agree with the District that the specific requirements of Section 1719-A are not the only considerations that contribute to an analysis of whether a charter application establishes that the school will fulfill the legislative intent of the CSL. In *Central Dauphin School District*, this Court analyzed the charter applicant's compliance with Section 1719-A separately from its fulfillment of the CSL's legislative intent. 847 A.2d at 204-05. We agreed with the Board that the charter applicant, which focused on gifted students, would provide educational opportunities that were "innovative and distinct[]" from the district's own gifted programs; therefore, the application fulfilled the CSL's legislative intent. *Id*.

Here, the issue is not the nature of Summit's proposed approach, which is based on the school operating as a "democratic school community" with students having an "active voice" and sharing in the school's governance. *See* Board Op. at 9-10. The question is whether Summit has shown that it can actually fulfill the promise of its theoretical approach. In *Central Dauphin School District*, the applicant showed it was prepared to address the needs of all enrolled students (not just gifted students), that it met all other necessary requirements to set the groundwork for success according to its innovative model, and that it was capable of providing a comprehensive learning experience for students. 847 A.2d at 202,

36

204-05. We agreed with the Board that the applicant conformed with the CSL's legislative intent. *Id*. In *Vision Academy*, when this Court concluded that the charter had met the "comprehensive learning experiences" requirement, we also concluded that the applicant had shown conformity with the CSL's legislative intent. *Vision Acad. Charter*, slip op. at 20, 2023 WL 2702373, at \*10.

Here, in contrast with those cases and as analyzed above, we agree with the Board that Summit has failed to meet the baseline academic requirements of the CSL. The Board did not disregard substantial record evidence when it found significant deficiencies with multiple aspects of Summit's application and concluded that due to those problems, Summit "falls short" of demonstrating its ability to actually achieve the CSL's intent that a charter school increase student learning opportunities, encourage different and innovative teaching methods, and serve as a viable alternative choice to district schools. Board Op. at 20. In light of the extensive analyses above, the Board did not err in determining that because Summit's application did not show an ability to fulfill its basic academic function, it also failed to conform with the CSL's legislative intent.

### C. Model for Other Public Schools

Subsection 1717-A(e)(2)(iv) requires charter applications be reviewed in terms of "the extent to which the charter school may serve as a model for other public schools." 24 P.S. § 1717-A(e)(2)(iv). In *Central Dauphin School District*, we agreed with the Board that the applicant had shown it could serve as a model for other public schools because it had met the fundamental requirements of the CSL and had also shown compliance with the CSL's legislative intent; this was so even though the local district also offered programs for gifted students, which were the

37

charter's primary focus. 847 A.2d at 204-05. Similarly, in *Vision Academy*, after we concluded that the charter applicant had met the "comprehensive learning experiences" requirement, we also concluded that the school could serve as a model for other public schools. *Vision Acad. Charter*, slip op. at 20, 2023 WL 2702373, at *11.

Here, the District concluded that the multiple deficiencies of Summit's application rendered it unable to serve as a model for other public schools. District Op. at 52. The Board agreed, stating that "[b]ecause of the above-noted deficiencies with Summit's curriculum planning . . . and its inadequate provisions for employee health insurance and retirement benefits, Summit is incapable of serving as a model for other public schools." Board Op. at 21.

Summit argues that even if its application was "marked by certain deficiencies," this does not mean that Summit cannot serve as a model for other public schools. Summit's Br. at 41. We disagree. As with legislative intent, the issue is not Summit's philosophy, which is based on the school operating as a "democratic school community" with students having an "active voice" and sharing in the school's governance. *See* Board Op. at 9-10. The question is whether Summit has shown that it can actually fulfill the promise of its theoretical approach and serve as a model for other public schools.

In both *Central Dauphin School District* and *Vision Academy*, we first concluded that the applicant had shown it was prepared to address the academic needs of all enrolled students and met all other necessary requirements to set the groundwork for success according to its innovative model. This showed that it was capable of serving as a model for other public schools. *See Central Dauphin Sch.*

*Dist.*, 847 A.2d at 198, 202, 204-05; *Vision Acad. Charter*, slip op. at 20, 2023 WL 2702373, at *11.

Here, by contrast, Summit has failed to meet the baseline academic requirements of the CSL. As discussed above, the Board did not disregard substantial record evidence when it found significant deficiencies with multiple aspects of Summit's application and concluded that by extension, Summit's application did not provide a basis for it to serve as a model for other public schools. Board Op. at 21. We agree with the Board's approach and conclude that it did not err in this regard.

## IV. Conclusion

Based on the foregoing, the Board did not err in concluding that Summit's third charter application failed to satisfy the requirements of Section 1717-A(e)(2) of the CSL. 24 P.S. § 1717-A(e)(2). Accordingly, the Board's order affirming the District's denial of Summit's third application for a school charter is affirmed.

_____
CHRISTINE FIZZANO CANNON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Summit Charter School,              :
                    Petitioner      :
                                    :
        v.                          :
                                    :
Pocono Mountain School District     :
(Charter School Appeal Board),      :       No. 501 C.D. 2023
                    Respondent      :

# **O R D E R**

AND NOW, this 20th day of May, 2024, the April 22, 2023, order of the Charter School Appeal Board, which affirmed the February 4, 2021, order of the Pocono Mountain School District, which denied the third application of Summit Charter School for a school charter, is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge